Steven W. **SABASTA** and Sioux Falls Insulation Supply, Inc., a South Dakota corporation, d/b/a Sioux City Insulation & Supply, Inc., Plaintiffs,

v.

**BUCKAROOS, INC.,** Defendant.

No. 4:06–cv–180.

United States District Court,
S.D. Iowa,
Central Division.

Feb. 3, 2010.

Daniel J. Lueders, William A. McKenna, Charles Johnson Meyer, Woodard Emhardt Moriarty McNett & Henry LLP, Indianapolis, IN, James S. Zmuda, Califf & Harper PC, Moline, IL, for Defendant.

Debra Lynne Hulett, Nyemaster Goode West Hansell & O'Brien PC, Des Moines, IA, Sander J. Morehead, Tim R. Shattuck, Woods Fuller Shultz & Smith PC, Sioux Falls, SD, for Plaintiffs.

## ORDER

ROBERT W. PRATT, Chief Judge.

Plaintiffs, Steven W. Sabasta and Sioux Falls Insulation Supply, Inc. (referenced collectively hereinafter as "Plaintiff"[1] or "Sabasta"), filed the present action for patent infringement on April 17, 2006. Clerk's No. 1. Plaintiff's Complaint alleges that Sabasta is the original inventor of a roll-bending die used to make saddles for pipe insulation. Compl. ¶ 2. Sabasta was granted United States Patent No. 6,751,-995 ("the '995 Patent") on June 22, 2004. *Id.* According to the Complaint, Defendant, Buckaroos, Inc. ("Buckaroos" or "Defendant"), has commercially exploited Sabasta's invention since March 2005 "by manufacturing and selling certain pipe insulation saddles[2] that were made with a process that infringes upon the '995 Patent." *Id.* ¶ 7.

Before the Court are two motions filed by Defendant: Buckaroos' Motion for Summary Judgment of Invalidity of Claims 1–6 and 14–15 (Clerk's No. 118) and Buckaroos' Motion for Summary Judgment of Inequitable Conduct (Clerk's No. 128). In its Motion for Summary Judgment of Invalidity of Claims 1–6 and 14–15, Buckaroos asserts that Claims 1–6 and 14–15 of the '995 Patent are invalid as obvious under 35 U.S.C. § 103. Clerk's No. 118 at 1–2. In its Motion for Summary Judgment of Inequitable Conduct, Buckaroos contends that Sabasta violated the duty of candor by failing to inform the United States Patent and Trademark Office ("USPTO" or "PTO") of certain material prior art. Clerk's No. 128 at 2. Sabasta filed resistances to both motions (Clerk's Nos. 161, 167), and Buckaroos filed replies (Clerk's Nos. 187, 214).[3] The matters are fully submitted.

## I. FACTUAL BACKGROUND

Sabasta first started making and selling pipe insulation saddles in approximately May 2000. Pl.'s Material Facts in Support of Resistance to Mot. for Summ. J of Invalidity (hereinafter "Pl.'s Material Facts 1") ¶ 1. These pipe saddles were made with a three roll-bending machine and did not have flared ends or ribs pressed into them. *Id.* ¶¶ 2–3. In mid–2000, Sabasta constructed a prototype ribbed and flared sad-

---

1. While there are two separately named Plaintiffs in the present matter, the Court will refer to "Plaintiff" in the singular for ease of reference.

2. Pipe saddles are essentially bent or curved pieces of metal designed to support hanging pipes, with or without insulation. The metal saddle shape is commonly produced using a "roll-bending" process, whereby a blank piece of metal is run through a machine that forms the metal into an arcuate shape. Pipe saddles often have flared ends, and some pipe saddles have radial "ribs" in them, intended to strengthen the saddle and inhibit the hanger from sliding.

3. Plaintiff also filed a sur-reply to Defendant's reply with respect to the Motion for Summary Judgment of Invalidity. *See* Clerk's No. 202.

dle. *Id.* ¶ 4. Sabasta, however, could not mass produce the prototype ribbed and flared saddle with the three-roll-bending equipment, but after researching the matter, determined that specially-fabricated dies used in conjunction with a two roll-bending machine could efficiently produce the ribbed and flared pipe saddles. *Id.* ¶¶ 5–6. Sabasta purchased a two roll-bending machine, the Acrotech Model 1618, in June 2001, and worked with Acrotech to fabricate specially designed dies. *Id.* ¶ 7; Def.'s Material Facts in Support of Mot. for Summ. J. of Inequitable Conduct (hereinafter "Def.'s Material Facts 2") ¶ 2, 7.

Acrotech is a company that makes roll-bending machinery. Acrotech has been promoting and selling the Acrotech Model 1618, a two roll-bending machine that uses an upper roll tube assembly, or "die," in conjunction with a lower pliable roller, since 1986. Def.'s Material Facts in Support of Mot. for Summ. J. of Invalidity (hereinafter "Def.'s Material Facts 1") ¶¶ 1, 5. The machine was sold with a manual and Acrotech has marketed and promoted materials in relation to the Acrotech 1618 machine for years. *Id.* ¶¶ 2–4. To use the Acrotech machine to make smaller diameter pieces, the standard roll tube assembly is replaced with a mounting block referred to as a "Small OD" attachment that uses a die arrangement such as a 1″ or 2″ shaft assembly. *Id.* ¶ 4. When the Acrotech machine is configured with the Small OD attachment, the die of each shaft assembly includes mounting portions at each end, where each die end engages two cam rollers on the Small OD attachment to align the die. *Id.* ¶ 5. The cam roller arrangement is standard equipment on the Acrotech machine with the Small OD configuration, and Sabasta was aware

of this fact. *Id.* ¶¶ 6–7. Standard shaft assemblies in the Acrotech machine with the Small OD attachment include a threaded shaft at one end that is bolted to the machine. Def.'s Material Facts 1 ¶ 6. Sabasta received a manual for the Acrotech machine he purchased in 2001 and read it several times. Def.'s Material Facts 2 ¶¶ 8–9.

Sabasta first produced ribbed and flared saddles using the specially designed dies in September 2001, and first sold pipe saddles manufactured using the subject matter of the '995 Patent in October 2001. *Id.* ¶¶ 8–9. In July 2002, Sabasta contacted patent counsel to see about filing a patent on the subject matter of the '995 Patent. Pl.'s Material Facts in Support of Resistance to Mot. for Summ. J. of Inequitable Conduct (hereinafter "Pl.'s Material Facts 2") ¶ 2. Sabasta relied on his patent attorney to advise him regarding the patentability of his invention, and to submit appropriate documents, information, and argument to the USPTO. *Id.* ¶ 3. Sabasta provided numerous documents to his patent attorney, including photographs of ribbed and flared dies, and photographs of and documents relating to the Acrotech 1618 Machine. *Id.* ¶ 4.

Sabasta, via his attorneys, filed Patent Application No. 10/215,614 (the '614 Application)[4] on August 9, 2002, and submitted certain prior art with his filing. Def.'s Material Facts 2 ¶¶ 10, 16; Pl.'s Material Facts 2 ¶ 6. Though Sabasta did submit an Information Disclosure Statement to the USPTO, he did not submit any information regarding the Acrotech Model 1618 machine or its manual in his disclosure. Def.'s Material Facts 1 ¶¶ 24–25. During the patent application process, Sabasta signed an oath acknowledging his duty of

---

4. The '614 Application eventually matured into the '995 Patent. Def.'s Material Facts 2 ¶ 10.

candor to the USPTO. Def.'s Material Facts 2 ¶ 12. The USPTO mailed an "Office Action" on October 8, 2003, rejecting claims 1–5, 10, 15, and 20 of the '614 Application under 35 U.S.C. § 103(a) in view of Howell (3,150,707).[5] *Id.* ¶ 18; Def.'s Material Facts 1 ¶ 21. The Office Action also rejected claims 1 and 2 of the '614 Application under the same statutory authority over Okude [6] in view of Hanson.[7] Def.'s Material Facts 2 ¶ 18. On December 23, 2003, Sabasta submitted an Amendment to the '614 Application, amending as-filed independent claims 1 and 15 to incorporate as-filed dependent claims 6 and 16. *Id.* ¶ 19. The '995 Patent issued on June 22, 2004.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if the dispute over it might affect the outcome of the suit under the governing law. *Id.* The moving party has the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. In meeting its burden, the moving party may support his or her motion with affidavits, depositions, answers to interrogato-

ries, and admissions. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the nonmoving party must go beyond the pleadings and, by affidavits, depositions, answers to interrogatories, or admissions on file, designate the specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. In order to survive a motion for summary judgment, the nonmoving party must present sufficient evidence for a reasonable trier of fact to return a verdict in his or her favor. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548. On a motion for summary judgment, a court is required to "view the evidence in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences." *See United States v. City of Columbia,* 914 F.2d 151, 153 (8th Cir.1990) (citing *Woodsmith Pub. Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990)). A court does not weigh the evidence or make credibility determinations. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *Id.*

A court must keep in mind that summary judgment is not a paper trial. Accordingly, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, this Court has but one task, to decide, based on the evidence of record as identified in the parties' moving and resistance papers, whether there is

---

5. The Howell patent issued on September 29, 1964. Def.'s Material Facts 1 ¶ 15.

6. Okude was published in July 1987. *Id.* ¶ 16.

7. The Hanson patent issued on June 26, 1962. *Id.* ¶ 17.

any material dispute of fact that requires a trial. *See id.* (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505 and 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2712 (3d ed. 1998)). The parties then share the burden of identifying the evidence that will facilitate this assessment. *Waldridge*, 24 F.3d at 921. Nevertheless, "[s]ummary judgments in favor of parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson*, 149 F.3d 821, 824 (8th Cir.1998).

## III. LAW AND ANALYSIS

### A. *Are Claims 1–6 and 14–15 Invalid as Obvious?*

An issued patent is presumed valid. *See* 35 U.S.C. § 282; *Cardinal Chem. Co. v. Morton Int'l*, 508 U.S. 83, 93 n. 15, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993). To overcome this presumption of validity, an objecting party must demonstrate facts establishing a patent's invalidity by clear and convincing evidence. *See Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1319 (Fed.Cir.2003) (citing 35 U.S.C. § 282). One ground for invalidating a patent is obviousness. Title 35, United States Code § 103(a) provides:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

■ In *Graham v. John Deere Co. of Kansas City*, the United States Supreme Court laid out a framework for determining obviousness under § 103, noting that while "the ultimate question of patent validity is one of law, the § 103 condition ... lends itself to several basic factual inquiries." 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Such inquiries require the Court to examine: 1) the scope and content of the prior art; 2) the level of ordinary skill in the art; and 3) the differences between the claimed invention and the prior art. *Id.* "Against this background the obviousness or nonobviousness of the subject matter is determined." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) (citing *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684). If Defendant successfully establishes a prima facie case of obviousness, the burden of production then shifts to Plaintiff to present evidence that would support a contrary conclusion. *See In re Sullivan*, 498 F.3d 1345, 1351 (Fed.Cir. 2007). "Evidence rebutting a prima facie case of obviousness can include: evidence of unexpected results, evidence that the prior art teaches away from the claimed invention in any material respect, and evidence of secondary considerations." *Id.* (internal quotations and citations omitted). Secondary considerations include such items as " 'commercial success, long felt but unsolved needs, failure of others, etc., [which] might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.'" *KSR*, 550 U.S. at 399, 127 S.Ct. 1727 (quoting *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684).

#### 1. *Prima facie considerations.*

#### a. *The scope and content of the prior art.*

■ The scope of the prior art is defined as encompassing that which is "reasonably pertinent to the particular problem with which the inventor was involved." *Stratoflex, Inc. v. Aeroquip Corp.*, 713

F.2d 1530, 1535 (Fed.Cir.1983). Prior art "encompasses not only the field of the inventor's endeavor but also any analogous arts." *In re GPAC Inc.*, 57 F.3d 1573, 1577–78 (Fed.Cir.1995). "To ascertain the scope of the prior art, a court examines the field of the inventor's endeavor, and the problem with which the inventor was involved, at the time the invention was made." *Monarch Knitting Mach. Corp. v. Sulzer Morat GmbH*, 139 F.3d 877, 881 (Fed.Cir.1998) (internal quotation and citation omitted); *see also Bausch & Lomb v. Barnes–Hind/Hydrocurve*, 796 F.2d 443, 449 (Fed.Cir.1986) ("To determine whether a reference is within the scope and content of the prior art, first determine if the reference is within the field of the inventor's endeavor. If it is not, then consider whether the reference is reasonably pertinent to the particular problem with which the inventor was involved.").

Defendant asserts that relevant prior art references for purposes of this case are the patents identified in the patent examiner's Office Action, namely Howell (U.S. Patent No. 3,150,707), Okude (JP 0156025), Hanson (U.S. Patent No. 3,040,799), and Valentine (U.S. Patent No. 3,610,011). According to Defendant, each of these prior art references teaches some underlying component of producing ribbed and flared dies in a two roll-bending machine. *See* Def.'s Invalidity Br. at 6–7.[8] The Patent Examiner found the following with regard to the prior art of Howell, Okude, and Hanson:

> Howell illustrates in Figures 1, 2 and 9 a roll-bending die comprised of a body member 35 having a ridge portion in the form of dimples or protuberances 55 (see Figure 10) extending about the circumference of the body member (see Figure 6) in cooperation with a pliable roller 36. As the sheet material 21 is fed through the rollers 35, 36, the material 21 is formed into an arc by the action of the dimples and the pliable material on the roller 36.
>
> . . .
>
> Okude illustrates the basic claimed bending die where bending rolls 5a, 5b, 25 selectively produce longitudinal ribs P4 in the sheet material P1 by at least one ridge portion (unlabeled) and form the sheet material into an arc. Okude shows that the opposed rolls are fixed during the rib forming operation and the rolls are not pliable. However, it is common in the art as taught by Hanson to use a ridge forming roll 5 in conjunction with a pliable roll 20 for the purpose of forming ridges 17 in sheet material without effecting previously formed patterns on the workpiece.

Def.'s Invalidity App. at 178–79.

Additionally, Defendant points to the Acrotech Model 1618 Machine as prior art. Def.'s Invalidity Br. at 5. Defendant specifically points out that the Acrotech Model 1618 machine contains as standard equipment the "Small OD" attachment which uses 1″ or 2″ shaft assemblies that have mounting portions at each end that engage cam rollers on the Small OD attachment to align the die. *Id.* Plaintiff does not contest Defendant's identification of the prior art

---

**8.** The parties largely treat the Motion for Summary Judgment of Invalidity of Claims 1–6 and 14–15 and the Motion for Summary Judgment of Inequitable Conduct as comprising one motion, although the two are separately captioned. In fact, Plaintiff's Motion for Summary Judgment of Inequitable Conduct relies primarily on references to the Appendix for the Motion for Summary Judgment of Invalidity. Due to the overlapping nature of the pleadings, the Court will, in the interest of clarity, reference the briefs and appendices filed in support of the respective motions with either the term "Invalidity" or "Inequitable." For instance, the Court will reference either "Def.'s Invalidity Br." or "Def.'s Inequitable Br." and "Pl.'s Invalidity App." or "Pl.'s Inequitable App."

references or their scope for purposes of the present motion. The Court, accordingly, finds the relevant prior art to be that identified in Defendant's Brief, i.e., Howell, Okude, Hanson, Valentine, and the Acrotech 1618 machine. *See id.* at 4.

b. *The level of ordinary skill in the art.*

 "[A] person having ordinary skill in the art," for purposes of § 103, refers to a "hypothetical person who is presumed to be aware of all the pertinent prior art." *Custom Accessories, Inc. v. Jeffrey–Allan Indus., Inc.,* 807 F.2d 955, 962 (Fed.Cir. 1986). A "person of ordinary skill in the art" is "presumed to be one who thinks along the line of conventional wisdom in the art and is not one who undertakes to innovate, whether by patient, and often expensive, systematic research or by extraordinary insights, it makes no difference which." *Std. Oil Co. v. Am. Cyanamid Co.,* 774 F.2d 448, 454 (Fed.Cir.1985). In making a determination of the appropriate level of ordinary skill in the art, a court may consider multiple factors, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *Ruiz v. A.B. Chance Co.,* 234 F.3d 654, 667–67 (Fed.Cir.2000) (internal quotations and citation omitted).

Defendant asserts that the requisite level of skill in the art in the field of the '995 Patent would be someone with a mechanical engineering degree or fifteen to twenty years experience in the field. Def.'s Invalidity Br. at 11. Defendant does not offer any independent support for the proffered skill level, but rather garners the standard from the testimony of Plaintiff's proposed expert, Dr. Abhijit Chandra, stating that "Buckaroos accepts [Dr. Chandra's] contention for purposes of this motion." *Id.* at 11; *see also* Def.'s Invalidity Reply Br.

at 5 ("Buckaroos accepted Sabasta's expert's contentions regarding the level of skill in the roll-bending field for purposes of this motion.").

Plaintiff asserts that Defendant has overstated Dr. Chandra's testimony by "tak[ing] one snippet of testimony from [his] deposition." Pl.'s Invalidity Resistance Br. at 12. Dr. Chandra testified on this topic as follows:

Q. What would be your understanding of a person of ordinary skill in the context of this patent? And by that, I mean, the patent in suit.

A. Mechanical engineer. You know, say, a bachelor's degree.

Q. Do you consider yourself a person of ordinary skill in the art relevant to this patent?

A. Yes, I think I have, you know, the ordinary skills.

Q. And you defined—you said a person of ordinary skill would include a bachelor's degree or at least a bachelor's degree. Could they be a person of ordinary skill without a bachelor's degree in engineering?

A. Possible. Possible.

Q. What would you consider sufficient?

A. It has to be on an individual-by-individual basis. It's very difficult to say—make a blanket statement who has the skill and who doesn't.

Q. Well, what would you consider....

A. Somebody who probably has an associate's degree but has, you know, 15, 20 years experience, that person can have the skill.

Q. In your opinion, would someone need a bachelor's degree in engineering or the equivalent in order to understand this patent?

A. Not necessarily.

Q. Okay.

A. But having the degree would help.

Q. Would a person with, say, a high school degree be able to understand this patent?

A. If the person has a technical background, yes, that person may have a skill. But, otherwise, you know, you are asking me—you know, like, this is too much of a generalization. I cannot do that.

Q. Would a person who has a science degree from undergrad, not an engineering degree, but a different science degree—let's just say in mechanical arts—be able to understand this patent?

A. Possibly.

Q. Would a person with manufacturing experience—and I believe you said 15 years a minute ago—15 years of manufacturing experience in the roll forming industry be able to understand the patent?

A. Yeah, I would guess so.

Q. Would a person with ten years of experience in the roll forming industry be able to understand the patent?

A. Maybe. Again, it depends on the individual. It's very difficult to say, you know, what Person A would do and what Person B would do.

Pl.'s Invalidity App. at 50–51.

■ Since neither party points to any testimony or evidence other than that of Dr. Chandra in support of a proposed determination of the ordinary level of skill in the pertinent art, the Court accepts that the ordinary level of skill is that defined by Dr. Chandra. Specifically, the Court determines that a person of ordinary skill in the art is a hypothetical individual with either a bachelor's degree in mechanical engineering, or a lesser level of education combined with approximately fifteen years of technical or equivalent experience in the field of roll-bending.[9]

c. *The differences between the claimed invention and the prior art.*

According to Defendant, "the only difference between Sabasta's machine and the standard Acrotech machine are the ribs and flares on the dies." Def.'s Invalidity Br. at 7 (emphasis omitted). Plaintiff does not specifically contest Defendant's contention in this regard, but rather moves straight to an assertion that the combination of established prior art elements was innovative and nonobvious. Nonetheless,

9. Plaintiff goes on to contend that several people associated with this case, including Mac Deichman, Steven Sabasta, and Dale Oliver, have the requisite level of ordinary skill in the art, based on their experience and expertise in fields related to roll-bending technology. There is no need to identify actual people with ordinary skill in the art, however, as the obviousness determination must be made "entirely with reference to a *hypothetical* person" with ordinary skill in the art:

It is only that hypothetical person who is presumed to be aware of all the pertinent art. The actual inventor's skill is irrelevant to this inquiry, and this is for a very important reason. The statutory emphasis is on a person of ordinary skill. Inventors, as a class, according to the concepts underlying the Constitution and the statutes that have created the patent system, possess something—call it what you will—which sets them apart from the workers of ordinary skill, and one should not go about determining obviousness under § 103 by inquiring into what patentees (i.e., inventors) would have known or would likely have done, faced with the revelation of references.

*Bausch & Lomb, Inc.*, 796 F.2d at 448 (quoting *Std. Oil*, 774 F.2d at 454); *see also In re Nilssen*, No. 91–1123, 1991 WL 73272, at *1 (Fed.Cir. May 8, 1991) ("The hypothetical person standard is not merely an aid to help an examiner or judge evaluate a claimed invention for obviousness. Rather, the hypothetical person test is the standard for determining obviousness.").

as part of its analysis, the Court must make a comparison of the objected-to claims and the prior art.

Broadly, Claim 1 of the '995 Patent encompasses a "roll-bending die for being used with a roll-bending machine for producing rib reinforced material." *See* Clerk's No. 1–2 at 11. The die is designed to be attached to a roll-bending machine such that it will selectively engage a pliable roller to permit material fed through the pliable roller and die to be formed into an arcuate shape. *Id.* The die has "at least one ridge portion" that will permit a ridge or rib to be pressed into the material as part of the arc forming process. *Id.* Additionally, the die will have a pair of mounting portions "adapted for being engaged by a plurality of cam rollers" on the roll-bending machine to maintain the die's alignment on the roll-bending machine. *Id.* Dependent Claim 2 further clarifies that the ridge portion of the die will "extend around the circumference" of the die to create a circumferential ridge in the rolled material. *Id.* Dependent Claim 3 provides that the die will comprise "at least one flared ridge," such that the rolled material will have a "flared portion." *Id.* Dependent Claim 4 further clarifies that the flared ridge "annularly extends around" the die so that it will create a "circumferential flared portion" in the rolled material. *Id.* Dependent Claim 5 provides that the flared ridge of the die will be "positioned adjacent one of a pair of opposing ends of said body member such that said flared ridge is adapted for forming the circumferential flared portion adjacent one of a pair of free ends" of the rolled material. *Id.* Dependent Claim 6 provides that the die will "compris[e] a threaded shaft" that is adapted for extending through the mounting block of the roll-bending machine. *Id.* Claim 14 is identical to Claim 1, except that it discusses "a plurality of ridge portions" and incorporates the language of Dependent Claims 2

(adapted to reflect ridge portions, rather than a ridge portion), 3 (adapted to reflect a "pair of flared ridges" rather than "at least one flared ridge"), 4 (adapted to reflect the plural form of the flared ridges), and 5 (adapted to reflect the plural form of the flared ridges). Dependent Claim 15 is identical to Dependent Claim 6, save for its reference to Claim 14 rather than Claim 1.

The Court concurs with the Patent Examiner that Howell clearly illustrates a roll-bending die with ridges or protuberances extending about the circumference of the body member for use with a pliable roller. *See* Def.'s Invalidity App. Ex. H at 178. The Court also concurs that Okude and Hanson clearly teach the use of a ribbed die for producing rib-reinforced rolls by a roll-bending process. *See id.* Exs. I, J. The Acrotech 1618 Manual, concededly known to Plaintiff, demonstrates a two roll-bending machine. *See id.* Ex. C. The Acrotech machine also comes standard with a "Small OD Attachment," for use when diameters need to be smaller than would be permitted using the standard top roll on the two roll-bending machine. *Id.* at 42. The manual states:

> The Small OD Attachment ... is a universal bridge support that is designed to accept a wide variety of small mandrels and Slip–On Tubes for accurately curving different pieceparts of small diameters and short lengths. The Attachment replaces the upper steel shaft, and essentially consists of a beam to which are attached shaft assemblies ... of different lengths and diameters. Slip–On Tubes can be used over these shafts or mandrels for special size combinations. The complete assembly is engineered so that whichever mandrel and/or tube is used, it will always bear against the urethane roll to curve a perfect part.

*Id.* at 45. Plaintiff concedes that when the Acrotech machine is configured with the

standard Small OD Attachment, the standard die shaft assemblies included therewith include mounting portions at each end which engage two cam rollers on the Small OD Attachment to align the die. *See* Def.'s Material Facts 1 ¶ 11. Therefore, the use of mounting portions on a die to engage cam rollers on a two roll-bending machine, as articulated in Claims 1 and 14, is taught by the prior art of the Acrotech machine.

The Court concludes that all of the components of the identified claims, i.e., the use of a two-roll-bending machine for producing arcuate metal, the use of ribbed or flared dies for creating ribs and/or flares in the metal, and the use of mounting portions to engage cam rollers for purposes of aligning the die, are apparent individually or in varying combinations in the prior art. Notably, Defendant does not point the Court directly to a prior art reference that employs flares, as identified in claims 3–5 and 14, but contends it need not do so since the Patent Examiner explicitly rejected claims to a "ribbed die with ribs and flares in conjunction with a two roll-bending machine." Def.'s Br. at 15. This contention will be addressed *infra* in the Court's analysis of the legal question of obviousness. Regardless, the Court notes that Valentine, an identified prior art reference, teaches a two roll design with the top roll being "generally cylindrical in shape except for two annular protuberances 28 near the ends which are rounded," a functional equivalent of flares. Def.'s Invalidity App. Ex. K.

### 2. *Legal analysis of obviousness.*

In support of its contention that Claims 1–6 and 14–15 are obvious, Defendant argues that the file history in this case must be read as supporting the conclusion that Plaintiff has conceded that a combination of a ribbed and flared die with a two roll-bending machine is not patentable in view of the prior art. Def.'s Invalidity Reply Br. at 4. Indeed, Defendant claims the Patent Examiner specifically found that it was obvious to combine and/or modify any one of several prior art devices to include ribs and/or flares for use on a two-roll-bending machine. *Id.* To avoid the Patent Examiner's conclusion in this regard, Plaintiff cancelled Dependent Claim 6 as that claim was originally submitted and incorporated its limitations into the rejected Claim 1. Likewise, Plaintiff cancelled Dependent Claim 16 and incorporated its limitations into the rejected Claim 15 (ultimately issued as Claim 14). Since the only difference between the rejected claims and the issued claims is the addition of the limitation formerly found in Dependent Claims 6 and 16 (the limitation is identical in each), the sole basis for the issuance of the patent is the inclusion of the limitation that the die include "a pair of mounting portions" that "engag[e] a plurality of cam rollers of the roll-bending machine" to maintain the die's alignment with the machine. Defendant claims that the standard Small OD Attachment of the Acrotech 1618 machine contains precisely the features that Plaintiff relied on in overcoming the Patent Examiner's rejection, and contends that if Plaintiff had disclosed the Acrotech machine to the Patent Examiner as a prior art reference, the patent application clearly would have been determined to be obvious in light of the prior art:

> In other words, the obviousness conclusion here is nothing more than retracing (with one change) the exact obviousness analysis that the Patent Office did and to which Sabasta conceded. The one change is to use the Acrotech 1618 machine as the principal prior art reference, instead of using the Okud[e] patent. The patent examiner concluded that it was obvious to combine Okud[e] [which "illustrates the basic claimed bending die where bending rolls ... selectively produce longitudinal ribs in the sheet metal by at least one ridge portion

and form the sheet material into an arc"] with Hanson [which teaches using "a ridge forming roll in conjunction with a pliable roll for the purpose of forming ridges in sheet material without effecting previously formed patterns on the workpiece"]. Here, by using the Acrotech 1618 machine instead of Okud[e] in the analysis, one can for the same reasons conclude that the combination of Acrotech 1618 with Hanson would have been obvious. However, unlike the result in the Patent Office, Acrotech 1618 *does* have [a component that uses dies with mounting portions that engage a plurality of cam rollers on the roll-bending machine] whereas Okud[e] does not. *Id.*

To highlight the similarities between the patent claims and the Acrotech machine as prior art, Defendant has prepared the following chart comparing Claim 1 of the '995 patent to the Standard Acrotech 1618 machine:

| Part | Claim | Acrotech 1618 Machine |
|------|-------|------------------------|
| | 1. A roll-bending die for being used with a roll-bending machine for producing rib reinforced rolled material, the roll-bending die comprising: | Machine and Manual for "Roll-bending Machine Model 1618" |
| A | a body member being adapted for being rotatably coupled to the roll-bending machine such that said body member selectively engages a pliable roller of the roll-bending machine, said body member being adapted for being rotated by the pliable roller when the pliable roller is rotated by the roll-bending machine such that said body member rolls the material into an arc when the material is placed between said body member and the pliable roller; | 1″ Shaft Assembly (4) used in small OD attachment; Main assembly K–Prene Roll (4); See also 2″ Shaft Assembly |
| B | said body member comprising at least one ridge portion outwardly extending from a perimeter face of said body member, said ridge portion being adapted for pressing a rib into the material when the material is rolled between said body member and the pliable roller of the roll-bending machine; and | |
| C | said body member comprising a pair of mounting portions, each of said mounting portions outwardly extending from opposing ends of said body member, each of said mounting portions being aligned along a longitudinal axis of said body member, each of said mounting portions being adapted for being engaged by a plurality of cam rollers of the roll-bending machine for maintaining alignment of said body member with the pliable roller of the roll-bending machine. | 1″ Shaft Assembly (4) and cam rollers (3); see also 2″ Shaft Assembly |

Def.'s Invalidity Br. at 8. In short, Defendant contends: 1) Plaintiff applied for a patent on broad subject matter (Part A + B) that was rejected by the Patent Examiner on the basis of the prior art; 2) Plaintiff incorporated dependent claims into the independent claims of his patent submission, amounting to an admission that the original claims were not patentable (Plaintiff added Part C after the rejection); 3) the only distinction between the admittedly unpatentable claims (Part A plus Part B) and the patented claims is the addition of the mounting portion/camroller recitation (Part C); 4) the mounting portions/cam rollers are standard equipment on the Acrotech machine, but the Acrotech machine was not disclosed to the Patent Examiner as prior art; and 5) had the Patent Examiner seen the Acrotech manual, it would have rejected Plaintiff's

amended claims as obvious in light of the prior art of the Acrotech machine.

### a. *Prosecution history estoppel.*

■ The Court first addresses Defendant's argument that Plaintiff's incorporation of a dependent claim into the rejected independent claim amounts to an admission that the original claims, i.e., the claims without the "cam rollers," were not patentable and are, therefore, obvious. *Id.* at 9. Defendant cites *Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* in support of its proposition:

> A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid the prior art or to comply with § 112. We must regard the patentee as having conceded an inability to claim the broader subject matter or at least as having abandoned his right to appeal a rejection. In either case, estoppel may apply.

535 U.S. 722, 737, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002). Plaintiff counters that Defendant is improperly attempting to argue that the principles of prosecution history estoppel should apply to an invalidity analysis. Pl.'s Invalidity Resistance at 15. According to Plaintiff, Defendant's argument in this regard:

> is based upon a flawed assumption that has no support in the Patent Act or the case law interpreting it. Instead, "[t]he action of a patent applicant in voluntarily narrowing his claim to conform to the opinion of the patent examiner furnishes no basis in fact or reason for inferring that he has admitted the invalidity of the patent as issued, in whole or in part."

*Id.* (quoting *Mesinger v. W. Auto Supply Co.,* 375 F.Supp. 1143, 1146 (S.D.Fla. 1974)). Plaintiff also cites *TorPharm, Inc. v. Ranbaxy Pharmaceuticals, Inc.,* 336 F.3d 1322, 1330 (Fed.Cir.2003), in support

of the contention that prosecution history estoppel does not apply in determinations of invalidity. *Id.*

■ The doctrine of prosecution history estoppel is "one tool that prevents the doctrine of equivalents from vitiating the notice function of claims," in that it " 'precludes a patentee from obtaining under the doctrine of equivalents coverage of subject matter that has been relinquished during the prosecution of its patent application.' " *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.,* 234 F.3d 558 (Fed. Cir.2000) (quoting *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.,* 170 F.3d 1373, 1376–77 (Fed.Cir.1999)), *overruled on other grounds by* 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002); *see also Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 952 (Fed.Cir.1993) ("The essence of prosecution history estoppel is that a patentee should not be able to obtain, through the doctrine of equivalents, coverage of subject matter that was relinquished during prosecution to procure issuance of the patent.") The Supreme Court reaffirmed the purpose of the doctrine in *Festo:*

> Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process. Estoppel is a "rule of patent construction" that ensures that claims are interpreted by reference to those "that have been cancelled or rejected." *Schriber–Schroth Co. v. Cleveland Trust Co.,* 311 U.S. 211, 220–21, 61 S.Ct. 235, 85 L.Ed. 132 (1940). The doctrine of equivalents allows the patentee to claim those insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes. When, however, the patentee originally claimed the subject matter alleged to infringe but then narrowed the claim in response to a rejection, he may not argue that the surrendered territory comprised unfore-

seen subject matter that should be deemed equivalent to the literal claims of the issued patent. On the contrary, "[b]y the amendment [the patentee] recognized and emphasized the difference between the two phrases[,] ... and [t]he difference which [the patentee] thus disclaimed must be regarded as material." *Exhibit Supply Co. v. Ace Patents Corp.*, 315 U.S. 126, 136–37, 62 S.Ct. 513, 86 L.Ed. 736 (1942).

A rejection indicates that the patent examiner does not believe the original claim could be patented. While the patentee has the right to appeal, his decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does not reach as far as the original claim. Were it otherwise, the inventor might avoid the PTO's gatekeeping role and seek to recapture in an infringement action the very subject matter surrendered as a condition of receiving the patent.

Prosecution history estoppel ensures that the doctrine of equivalents remains tied to its underlying purpose. Where the original application once embraced the proposed equivalent but the patentee narrowed his claims to obtain the patent or to protect its validity, the patentee cannot assert that he lacked the words to describe the subject matter in question. The doctrine of equivalents is premised on language's inability to capture the essence of innovation, but a prior application describing the precise element at issue undercuts that premise. In that instance the prosecution history has established that the inventor turns his attention to the subject matter in question, knew the words for both the broader and narrower claim, and affirmatively chose the latter.

*Festo*, 535 U.S. at 736, 122 S.Ct. 1831.

The Court is unaware of, and Defendant has not provided citation to, any case that affirmatively stands for the argument that Defendant here advances, namely that prosecution history estoppel can be used to establish an admission or disavowal of rejected subject matter for purposes of invalidating a patent as obvious. In *TorPharm*, the most factually similar case available, TorPharm owned a patent providing for a crystalline form of ranitidine, an antihistamine drug that inhibits acid secretion in the stomach. 336 F.3d at 1324. As originally filed, the patent application did not include "bulk and tap density limitations"; rather, those limitations were added by amendment to overcome obviousness rejections by the USPTO. *Id.* TorPharm sued Ranbaxy for infringement of its patent as issued, and Ranbaxy moved for summary judgment of invalidity arguing, amongst other things, that the patent was invalid on the basis of prosecution history estoppel. *Id.* at 1325. In essence, Ranbaxy made the same argument advanced by Defendant in the present case: 1) TorPharm overcame an obviousness rejection only by adding limitations to the rejected claims; 2) the added limitations were in the prior art; 3) by amending its claims to incorporate the limitation, TorPharm acquiesced to the examiner's determination that the patent as originally submitted was obvious; and 4) TorPharm was, therefore, estopped from denying that the patent, as issued, was obvious over the prior art. *See id.* at 1330 ("Ranbaxy nonetheless maintains that the nonobviousness inquiry is here foreclosed, due to TorPharm's 'acquiescence' in the examiner's section 103 rejection during prosecution. The examiner rejected the pending claims as obvious [over prior art] but agreed that amending the claims to recite the bulk and tap densities ... would overcome this rejection. According to Ranbaxy, having agreed to amend the pending claims rather than argue that the process was patentable without any density limita-

tions, TorPharm is precluded from contesting the obviousness of the process claims now that material with the recited densities is known from the prior art.").

In concluding that nothing in the prosecution history of TorPharm's patent "overcomes the statutory mandate to assess the nonobviousness of an issued patent claim against the prior art, the Federal Circuit found that Ranbaxy's argument "blur[red] the distinction between *claims* and *limitations*":

> [P]atentability is assessed from the former, not the latter. That a particular limitation recited by a claim may be found in the prior art is surely relevant to the patentability of the claim, but it is hardly dispositive. Here, by amending its claim to recite the bulk and tap densities ... TorPharm "acquiesced," if at all, only to the proposition that a process claim lacking the density limitations would not be distinguished from the prior art.

*Id.* at 1330. Considering *TorPharm* in conjunction with the purposes of the doctrine of prosecution history estoppel, the Court concludes that the correct result lies, as it often does, somewhere between the respective positions of Defendant and Plaintiff. Defendant is correct in its proposition to the extent that, given the prosecution history in this case, Plaintiff cannot now advance the position that a roll-bending die without the mounting portion/cam roller limitation in Part C would be patentable.[10] Plaintiff, on the other hand is correct in its assertion that the "decision to submit different claims in response to the referenced office action may limit the scope of the '995 Patent for infringement purposes, but does not constitute an admission regarding invalidity." Pl.'s Invalidity Resistance Br. at 18; *see Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1346

(Fed.Cir.2005) ("*TorPharm* held that the applicant's 'acquiescence' in the obviousness rejection by amending its claims did *not* preclude the patentee from contesting obviousness in litigation.").

Even were the Court to accept the proposition that Plaintiff has conceded the obviousness of A + B (from Defendant's chart), it is clear that such a concession is not determinative of the obviousness of A + B + C. Defendant argues that evidence of Plaintiff's "concession" is merely the "starting point for [its] motion, namely [to demonstrate] that it was obvious to combine and/or modify any one of several of the prior art devices to include the claimed ribs and/or flares on two roll-bending machines as claimed (A + B)." Def.'s Invalidity Br. at 5. According to Defendant, the next logical step is to conclude that since combining A + B is obvious, "it follows that it was obvious to combine B with A + C (the Acrotech 1618 machine). Hence, A + B + C is obvious." *Id.* Defendant's proposition in this regard is based on flawed logic, and "blurs the distinction between claims and limitations," as was the case in *TorPharm*. *TorPharm*, 336 F.3d at 1330. The mere fact that A + B is not patentable in view of the prior art does not give rise to an automatic conclusion that A + B + C is unpatentable as obvious merely on the basis that the limitation in C, standing alone, may be obvious in light of the prior art. This is because in assessing the validity of the claims at issue in the present motion for summary judgment, as contrasted with the duty of the Patent Examiner to determine patentability in the first instance, the Court must "assess independently the validity of the claim against the prior art ... tak[ing] into account the statutory presumption of patent validity." *TorPharm*, 336 F.3d at 1329–30. In evalu-

---

**10.** As in *TorPharm*, however, Plaintiff "is not here arguing that a process free of those [Part C] limitations is patentable." 336 F.3d at 1330.

ating a *claim's* validity, the "determination of obviousness is made with respect to the subject matter as a whole, not separate pieces of the claim." *Sanofi–Synthelabo v. Apotex, Inc.*, 550 F.3d 1075, 1086 (Fed.Cir. 2008); 35 U.S.C. § 103 ("A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter *as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." (emphasis added)). Given the different standard of review applicable in the present proceedings, the Court concludes that a prosecution history estoppel theory does not provide an adequate or appropriate premise for Defendant's claim of an entitlement to summary judgment.

### b. *The import of the Patent Examiner's rejections.*

While the Court concludes that the doctrine of prosecution history estoppel is inapplicable to the present case, at least as Defendant seeks to employ it with regard to the present motion, this conclusion does not mean that the Court must totally disregard the fact that the Patent Examiner initially rejected Plaintiff's claims. Accordingly, some further discussion of the import of the Patent Examiner's determinations in the patent issuance process is warranted.

As an ordinary matter, a court will presume that a qualified government agency, such as the USPTO, has properly done its job. *See Am. Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359–60 (Fed. Cir.1984) ("When no prior art other than that which was considered by the PTO examiner is relied on by the attacker, he has the added burden of overcoming the deference that is due to a qualified government agency presumed to have properly done its job, which includes one or more examiners who are assumed to have some expertise in interpreting the references and to be familiar from their work with the level of skill in the art and whose duty is to issue only valid patents."). Nonetheless, the Federal Circuit has made clear that "the invalidity of a patent under 35 U.S.C. § 103 must be decided on the basis of prior art *adduced in the proceeding before the court.*" *Greenwood v. Hattori Seiko Co., Ltd.*, 900 F.2d 238, 241 (Fed.Cir.1990) (emphasis added).

In *Greenwood,* the owner of a patent entitled "Heart Rate Counter with Digital Storage and Numerical Readout" (the " '140 Patent") filed an infringement action against watchmaker Seiko, alleging that two Seiko models containing pulse-monitoring features infringed on the '140 Patent. *Id.* at 239. Prior to the lawsuit, Seiko requested a reexamination of the '140 Patent, citing certain prior art that Seiko contended raised a substantial new question as to the patentability of the subject matter of the '140 Patent. *Id.* During the reexamination proceeding, the Patent Examiner rejected each claim of the '140 Patent as obvious. *Id.* The patent owner responded to the rejection by filing an affidavit demonstrating conception prior to the date of Seiko's asserted prior art publications. *Id.* at 239–40. The Patent Examiner accepted the affidavit and issued a Reexamination Certificate, validating the '140 Patent. *Id.* In seeking to invalidate the '140 Patent as obvious in the subsequent infringement action, Seiko argued that the Patent Examiner had erred in reinstating the '140 Patent on the basis of the patent owner's affidavit. *Id.* The district court agreed with Seiko that the affidavit was inadequate and "apparently felt constrained to reinstate the examiner's rejection," holding that "if the affidavits are insufficient, the PTO's original finding in favor of Seiko [i.e., its rejection of the '140 Patent claims] should be restored." *Id.* (citation omitted). The Federal Circuit re-

versed the judgment of the district court, finding that the district court had "treated the reexamination as if it were part of Greenwood's suit against Seiko" and further finding that this "misperception[ ] caused [the district court] to disregard the presumption that all patents are valid." *Id.*

Once issued by the PTO, a patent is presumed valid and the burden of proving otherwise rests solely with the challenger. Here, the court's error was likely caused by Seiko, with possible assistance from Greenwood. In its brief on appeal, and presumably in the district court, Seiko's principal argument for invalidating the '140 patent was that the reexamination certificate should not have issued because Greenwood's Rule 131 affidavit was insufficient to antedate the three magazine publications cited in the reexamination. Greenwood's brief is similarly directed in large part to the adequacy of his affidavit. After establishing to the satisfaction of the district court that its position on the affidavit was correct, Seiko then apparently persuaded the court that it could reinstate the examiner's initial rejection for obviousness, which had been grounded in part on the three publications. The district court followed this approach and held the patent invalid under 35 U.S.C. § 103 based on the initial action of the examiner. As a result, the court did not analyze the publications, in conjunction with the other prior art references relied on by Seiko, in the manner required by the Supreme Court, and decisions of this court, to determine whether they would

have rendered the invention obvious under section 103.

*Id.* at 240–41.

 Interestingly, the *Greenwood* Court also stated: "[T]he fact that the examiner initially rejected Greenwood's claims under 35 U.S.C. § 103 is not proof of obviousness in the infringement action before the district court." 900 F.2d at 241. Read in isolation, this statement would clearly support a conclusion that the Court owes no deference to obviousness determinations of the patent examiner made prior to ultimate issuance of the patent. The import of the statement is muddied, though, by the court's next statement: "Before issuing the reexamination certificate, the examiner clearly withdrew his initial rejection." *Id.* The addition of this statement makes it unclear whether the *Greenwood* Court intended the statements, in conjunction, to mean: 1) a patent examiner's rejection of claims is never proof of obviousness, and in the *Greenwood* case, this is especially true because the patent examiner withdrew the rejection; or 2) a patent examiner's rejection of claims is not proof of obviousness in an infringement action in a situation where the examiner's initial rejection was withdrawn. The following statement by the Federal Circuit in *Quad Environmental Technologies Corp. v. Union Sanitary District*, however, supports a conclusion that the former interpretation is appropriate: "The courts are the final arbiter of patent validity and, although courts may take cognizance of, and benefit from, the proceedings before the patent examiner, the question is ultimately for the courts to decide, without deference to the rulings of the patent examiner." 946 F.2d 870, 876 (Fed.Cir. 1991).[11]

11. In *Fresenius Medical Care Holdings, Inc. v. Baxter Int'l Inc.*, the Court likewise rejected a defendant's argument that it was entitled to summary judgment on the basis that the Patent Board had already determined that a person with ordinary skill in the art would have been motivated to combine certain prior art elements:

The PTO's findings certainly support Fresenius' case. However, as this Court previously noted, a patent examiner's findings alone are insufficient to merit summary judgment in favor of the accused infringer on the issue of obviousness. This is especially true in light of the fact that a PTO examiner is only required to provide evi-

Given the Court's obligation to undertake an independent validity analysis, the fact that the patent examiner rejected Plaintiff's claims as initially submitted, does not, as the Court determined in its prosecution history estoppel analysis, bind the Court's invalidity analysis. Rather, the Court takes "cognizance of" the Patent Examiner's rejections and findings, and will consider them along with any and all evidence in the case to reach a conclusion on the question of whether the '995 Patent is invalid as obvious in light of the prior art. *See Quad Environmental,* 946 F.2d at 876.

### c. *Are the claims obvious in light of the prior art?*

██ Since there is no real dispute that all individual elements of the contested claims are present in the prior art, the Court must evaluate whether the combination of those prior elements would have been obvious to a person of ordinary skill in the art at the time of the invention. Plaintiff argues that Defendant has failed to point to any evidence of a teaching, suggestion, or motivation that would support a finding of obviousness. *See* Pl.'s Invalidity Br. at 19 (arguing that Defendant must "show specifically why it was 'apparent' to use a ribbed die with ribs and flares in conjunction with a two-roll-bending machine, such as an Acrotech 1618"). Defendant counters that it need not demonstrate a particular teaching, suggestion, or motivation in light of the Supreme Court's 2007 decision in *KSR,* 550 U.S. at 398, 127 S.Ct. 1727.

Allegations that a patent is obvious because it is nothing more than a combination of preexisting elements readily apparent in the prior art have long been subjected by the Federal Circuit to the "teaching/suggestion/motivation" ("TSM") test:

> Most if not all inventions arise from a combination of old elements. Thus, every element of a claimed invention may often be found in the prior art. However, identification in the prior art of each individual part claimed is insufficient to defeat patentability of the whole claimed invention. Rather, to establish obviousness based on a combination of elements disclosed in the prior art, there must be some motivation, suggestion or teaching of the desirability of making the specific combination that was made by the applicant.

*In re Kotzab,* 217 F.3d 1365, 1369–70 (Fed. Cir.2000). Indeed, in *Velander v. Garner,* the Federal Circuit expressly stated that, when "all the elements of an invention are found in a combination of prior art references":

> "[A] proper analysis under § 103 requires, *inter alia,* consideration of two factors: (1) whether the prior art would have suggested to those of ordinary skill in the art that they should make the claimed composition or device, or carry out the claimed process; and (2) whether the prior art would also have revealed that in so making or carrying out, those of ordinary skill would have a reasonable expectation of success."

348 F.3d 1359, 1363 (Fed.Cir.2003) (quoting *In re Vaeck,* 947 F.2d 488, 493 (Fed. Cir.1991)); *see also KSR,* 550 U.S. at 407, 127 S.Ct. 1727 ("[T]he Federal Circuit has

---

dence which 'as a whole shows that the legal determination sought to be proved (i.e., the reference teachings establish a prima facie case of obviousness) is more probable than not.' Thus, before granting sum-

mary judgment, a district court is required to review a patent's validity *independently* of the patent examiner.
No. C03–1431, 2006 WL 1343648, at *23–24 (N.D.Cal. May 16, 2006) (citations omitted).

employed [the TSM test], under which a patent claim is only proved obvious if the prior art, the problem's nature, or the knowledge of a person having ordinary skill in the art reveals some motivation or suggestion to combine the prior art teachings."); *PharmaStem Therapeutics, Inc. v. Viacell, Inc.*, 491 F.3d 1342, 1360 (Fed.Cir. 2007) (stating that obviousness may be shown by proof that a "person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing so"); *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1372 (Fed.Cir.2000) ("Therefore, 'when determining the patentability of a claimed invention which combines two known elements, the question is whether there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the combination.' ") (quoting *In re Beattie*, 974 F.2d 1309, 1311–12 (Fed.Cir.1992) (some internal quotations and citations omitted)); *Princeton Biochemicals v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (2005) (finding that § 103's "as a whole" provision "requires a showing that an artisan of ordinary skill in the art at the time of invention, confronted by the same problems as the inventor and with no knowledge of the claimed invention, would have selected the various elements from the prior art and combined them in the claimed manner. In other words, § 103 requires some new suggestion or motivation, before the invention itself, to make the new combination."). According to the Federal Circuit, courts " 'cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention.' " *Ecolochem*, 227 F.3d at 1371 (quoting *In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir.1988)). " 'Combining prior art references without evidence of such a suggestion, teaching, or motivation simply takes the inventor's disclosure as a blueprint for piecing together the prior art to defeat patentability—the essence of hindsight.' " *Id.* at 1371–72 (quoting *In re Dembiczak*, 175 F.3d 994, 999 (Fed.Cir. 1999)). Thus, according to the Federal Circuit, the TSM test is necessary because "case law makes clear that [rigorous application of the TSM test] is the best defense against [a] hindsight-based obviousness analysis." *Id.* at 1371 (citing *In re Dembiczak*, 175 F.3d at 999). Despite occasional language by the Federal Circuit indicating the contrary, however, the TSM test should not be applied rigidly. In *KSR*, the Supreme Court reversed a ruling by the Federal Circuit that held summary judgment inappropriate where the district court had not made specific findings to show a teaching, suggestion, or motivation to combine prior art elements. *KSR*, 550 U.S. at 419, 127 S.Ct. 1727 ("There is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis. But when a court transforms the general principle into a rigid rule that limits the obviousness inquiry, as the Court of Appeals did here, it errs."). In *KSR*, the District Court granted summary judgment in favor of KSR, concluding that a patent on adjustable throttle pedals for automobiles was obvious in light of the prior art. *Id.* at 412–13, 127 S.Ct. 1727. The Federal Circuit reversed, holding that the District Court had failed to make " 'finding[s] as to the specific understanding or principle within the knowledge of a skilled artisan that would have motivated one with no knowledge of [the] invention' " to combine the elements as they were combined in the patent at issue. *Id.* at 413–14, 127 S.Ct. 1727 (quoting *Teleflex, Inc. v. KSR Int'l Co.*, 119 Fed.Appx. 282, 288 (Fed.Cir.2005)). The Circuit stated that "unless the prior art references addressed the precise problem that the patent was trying to solve, the problem would not

motivate an inventor to look at those references." *Id.* at 414, 127 S.Ct. 1727 (citations omitted). While conceding that it may have been obvious to a skilled artisan to try to combine the elements at issue, the Circuit nonetheless found this fact irrelevant because " 'obvious to try has long been held not to constitute obviousness.' " *Id.* (quoting *Teleflex,* 119 Fed.Appx. at 289).

The Supreme Court reversed the Federal Circuit, finding that its "rigid and mandatory" application of the TSM test was inconsistent with the "expansive and flexible approach" to the obviousness inquiry emphasized in prior case law. *Id.* at 415, 127 S.Ct. 1727. The Court specifically found four flaws with the Federal Circuit's analysis: 1) it adhered to a "formalistic conception" of the TSM test with an "overemphasis on the importance of published articles and the explicit content of the issued patents"; 2) it narrowly assumed that a person of ordinary skill in the art would consider only prior art references designed to solve the same problem as the patent at issue; 3) it incorrectly concluded that a "patent claim cannot be proved obvious merely by showing that the combination of elements was 'obvious to try' "; and 4) it applied "[r]igid preventative rules that deny factfinders recourse to common sense." *Id.* at 419–21, 127 S.Ct. 1727. In so holding, the Supreme Court provided substantial guidance to be employed in making any obviousness assessment:

> Neither the enactment of § 103 nor the analysis in *Graham* disturbed this Court's earlier instructions concerning the need for caution in granting a patent based on the combination of elements found in the prior art. For over half a century, the Court has held that a "patent for a combination which only unites old elements with no change in their respective functions ... obviously withdraws what is already known into the field of its monopoly and diminishes the

> resources available to skillful men." *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 95 L.Ed. 162 (1950). This is a principal reason for declining to allow patents for what is obvious. The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results....

> The principles underlying [past] cases are instructive when the question is whether a patent claiming the combination of elements of prior art is obvious. When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, suing the technique is obvious unless its actual application is beyond his or her skill ... a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions.

> Following these principles may be more difficult in other cases than it is here because the claimed subject matter may involve more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for the improvement. Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason

to combine the known elements in the fashion claimed by the patent in issue. To facilitate review, this analysis should be made explicit. As our precedents make clear, however, the analysis need not seek out precise teaching directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ.

550 U.S. at 415–17, 127 S.Ct. 1727

*KSR* did not overrule or prohibit the use of the TSM test; rather it merely cautioned courts not to rigidly apply the test. Indeed, the *KSR* Court specifically noted that, since the time of its underlying ruling, the Federal Circuit has "elaborated a broader conception of the TSM test than was applied in the instant matter." *Id.* at 421, 127 S.Ct. 1727. The fact that the Court of Appeals had since "describe[d] an analysis more consistent with our earlier precedents," however, could not prevent a holding that the test had been inappropriately applied in the case under consideration. *Id.*; *see also id.* at 418–19, 421, 127 S.Ct. 1727 ("When it first established the requirement of demonstrating a teaching, suggestion, or motivation ... the Court of Customs and Patent Appeals captured a helpful insight.... Helpful insights, however, need not become rigid and mandatory formulas; and when so applied, the TSM test is incompatible with our precedents.").

The TSM test has not fallen out of favor with the Federal Circuit in the wake of *KSR.* Nearly a year after the Supreme Court's decision, the Federal Circuit, in *Ortho–McNeil Pharmaceutical, Inc. v. Mylan Labs., Inc.,* stated:

> The Supreme Court explained its reason for castigating a "rigid" TSM test: "The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." Indeed a rigid requirement of reliance on written prior art or patent references would, as the Supreme Court noted, unduly confine the use of the knowledge and creativity within the grasp of an ordinary skilled artisan.
>
> As this Court has explained, however, *a flexible TSM test remains the primary guarantor against a non-statutory hindsight analysis such as occurred in this case. In re Translogic Tech., Inc.,* 504 F.3d 1249, 1257 (Fed.Cir.2007) ("[A]s the Supreme Court suggests, a flexible approach to the TSM test prevents hindsight and focuses on evidence before the time of invention."). The TSM test flexibly applied, merely assures that the obviousness test proceeds on the basis of evidence—teachings, suggestions (a tellingly broad term), or motivations (an equally broad term)—that arise before the time of the invention as the statute requires. As *KSR* requires, those teachings, suggestions, or motivations need not always be written references but may be found within the knowledge and creativity of ordinarily skilled artisans.[12]

---

12. In keeping with the "flexible" standard of *KSR,* the Federal Circuit has specifically held that a finding of a teaching, motivation, or suggestion may come from "the common knowledge, or common sense of the person of ordinary skill in the art, without any specific hint or suggestion in a particular reference." *Rentrop v. Spectranetics Corp.,* 550 F.3d 1112, 1118 (Fed.Cir.2008). In *Rentrop,* the defendant objected to a jury instruction that provided:

> [T]here must have been some suggestion for a person skilled in the art to make the combination covered by the claims of the patent in issue in order for the claims to have been obvious. In other words, a claim in a patent is not obvious and invalid, simply because the claim combines elements

520 F.3d 1358, 1364–65 (Fed.Cir.2008) (emphasis added).

As noted, Defendant does not directly state any particular teaching, suggestion or motivation that would have compelled a person with ordinary skill in the art to combine the specific elements of the prior art into the subject matter of the '995 Patent. Rather, Defendant contends simply that it has "explained and the evidence demonstrates that the claim was merely a *combination of known parts* which were obvious to try in solving the identified problem as 'the combination would have been entirely predictable and grounded in common sense.'" Def.'s Invalidity Reply at 16. Because Defendant's primary argument for obviousness hinges on Defendant's theory of prosecution history estoppel,[13] the Court presumes that the "evidence" to which Defendant refers is that referenced in the sole

argument in Defendant's pleadings that does not rely on the now-rejected prosecution history estoppel theory. Specifically, Defendant summarily states in footnote 5 of its brief that the "Expert Report of engineer George Halmos,[14] while not required, nevertheless corroborates the references herein and explains that using ribbed dies on roll-bending machines would be known and understood as a use of common equipment to carry out a known technique." *Id.* at 16 n. 5.

Halmos' expert report identifies the elements of the '995 Patent's claims and compares them with the prior art, ultimately reaching conclusions about the obviousness of the asserted claims. *See generally* Def.'s Invalidity App. Ex. R. With respect to Claim 1, Halmos identifies the appearance of each individual element of the claim in prior art[15] and opines that "all elements mentioned in this claim were

that can all be found among the prior art references. It must have been a motivation or a suggestion to combine the limits in a manner disclosed by the patent.
550 F.3d at 1117–18. The *Rentrop* court found that the instruction was not a violation of *KSR* because it also included a definition of motivation providing that "motivation may arise from common knowledge, or common sense of the person of ordinary skill in the art, without any specific hint or suggestion in a particular reference." *Id.* at 1118.

13. Defendant argues that Plaintiff did not "invent a two-roll-bending machine, nor did he invent ribbed or flared dies or cam rollers. Sabasta did not even invent using an Acrotech machine in his industry. The Acrotech machine and other prior art references clearly teach the majority of the elements of claims 1–6 and 14–15." Def.'s Invalidity Br. at 15. Rather, according to Defendant, Plaintiff's patent claims were allowed specifically on the basis of adding the cam roller limitation, which was already well known in the prior art and worked in Plaintiff's die configuration as intended. *Id.* According to Defendant, Plaintiff has done nothing more than "'combine familiar elements according to known methods'" in a way that "'yield[ed] predictable results.'" *Id.* at 17 (quoting *KSR,* 550 U.S. at 416, 127 S.Ct. 1727). Defendant

urges that the "claimed combination is simply a modest, routine, everyday, incremental improvement combining existing elements with no change in their respective functions" and that "[s]uch a combination lacks sufficient inventiveness to merit patent protection." *Id.*

14. Several months after the Motion for Summary Judgment of Invalidity was fully submitted, Plaintiff filed a motion to exclude Halmos' expert report. *See* Clerk's No. 223. Given the Court's ultimate determination, *infra,* that the report is insufficient to warrant a finding of invalidity as a matter of law, the Court need not consider at this juncture the ultimate admissibility of Halmos' report.

15. Halmos states in pertinent part:

Roll-bending dies used with roll-bending machines are common and used for over 90 years for producing rib reinforced rolled material.... The Acrotech Roll-bending Machine Model 1618 manual teaches a two-roll principle utilizing a top steel roll and a urethane covered lower roll....
To an ordinary person knowledgeable in metal forming machinery, it is known that using a combination of a rotatable ribbed metal roll and a pliable roll will yield a ribbed, curved product from a flat material.

known in the industry and they are being used for their ordinary purposes." Def.'s Invalidity App. Ex. R at 224–26. With respect to Claim 2, Halmos undergoes the same process,[16] opining that to an "ordinary person skilled in the art it would be known that a body member having an annular ridge portion and working in conjunction with a pliable roller will produce bent material with a circumferential rib, regardless of whether the ribs are continuous or interrupted." Id. at 226. With respect to Claim 3, Halmos contends that the Valentine Patent (3,610,011) "teaches flanges (49) [flared ridges] formed at the edges of the truck fender in addition to the formed ribs," but does not make any additional conclusion. Id. at 226–27. With respect to Claim 4, Halmos again cites to Valentine, and additionally cites to the Japanese patent referenced by the Patent Examiner as Okude,[17] stating that it "is self understood that if the flared ridge of the body member is annularly extended from the body member, it will form a circumferential flared ridge in the material against bending similarly to a circumferential ridge or partial ridge and will reinforce the material against bending." Id. at 227. With respect to Claim 5, Halmos makes the same statement as he did with regard to Claim 4, noting that "[n]umerous curved products having flared edges are manufactured by the industry, from automotive bumpers to couplers." Id. at 228. With respect to Claim 6, Halmos states that a "threaded shaft outwardly extending from the mounting portions ... is typical installation in numerous commercially available equipment. The two-roll-bending machine supplied by Acrotech ... has this arrangement." Id. at 228. With respect to Claim 14, Halmos' analysis of prior art references is virtually identical to his analysis respecting Claims 1–5, and concludes that "all elements in this claim were known to the industry and are being used for their customary purposes." Id. at 237. Finally, with respect to Claim 15, Halmos' opinion is identical to that given for Claim 6. Id. In conclusion, Halmos states:

> Based on my experience, on a careful review of the related documents, including patents, technical literature and inspecting the ribbed saddle manufacturing at the Buckaroos plant in Nevada,

---

16. Halmos states that roll-bending dies with ridge portions are

> Forming ribs into the material with rolls having one or more protrusion to reinforce the produce is widely used by the industry in the last 100 years.... U.S. Patent No. 3, 040, 799 to Hanson claims: "Embossing rolls for embossing sheet metal comprising of a forming roll, provided with coaxial forming rings ... and a mating roll provided with a compressible outer liner that is compressed by the grooves formed by the outer peripheries of the forming rings in a sheet passed between the rolls."
> ...
> The cam rolls described in the Patent '995 appears to be substantially identical to the cam roll supports shown in the Acrotech "Operating Instruction and Parts List" supplied by Acrotech with a two-roll-bending machine....

Def.'s Invalidity App. Ex. R at 224–26.

regularly used by the industry and it is well known to a person with ordinary skill and familiarity with tin cans, drums, culvert pipes, ditch liners, [etc.].... US patent No. 3, 040, 799 to Hanson teaches a set of rolls, one being a ribbed rigid roll with annular ridge protrusion, the other one having a rubber liner, where a "sheet formed by the present is resistant to buckling" and the "roll provided with plurality for forming rings or flanges ... and a mating roll provided with a compressible outer liner that is compressed by the grooves formed by the outer peripheries of the forming rings in a sheet passed between the rolls."

Def.'s Invalidity App. at 226.

17. The Court notes that the Japanese patent 62–156025 is provided in Defendant's Invalidity Appendix in its original form, i.e., in Japanese, with no translation. See Def.'s App. Ex. I.

Iowa, my opinion is that all components of the claims discussed by Dr. Chandra were well known prior the filing of the patent application and are merely being used for their ordinary purposes.

Many patents and publications describe the two-roll-bending processes utilizing one rigid and one pliable roll. A two-roll-bending machine was supplied to Buckaroos by Acrotech on or before 1994 using one rigid and one pliable roll. Several suppliers are offering this type of two-roll-bending machine.

The stiffening effect of ribs on bent sheet metal is well known to a person in the industry with ordinary skill and familiarity with tin cans, drums, culvert pipes, ditch liners, grain binds, couplers, rings, ventilation and many other products. Roll-bending dies with ridge portion (or plurality of ridge portions) annularly extending around a body member were regularly used by the industry and there are patents describing equipment to produce such ribbed and/or flanged products. A person with ordinary skill and knowledgeable in the art can easily implement a change by adding ribs to the rigid roll surface of a two-roll-bending machine. This can be considered as a simple variation that happens daily in the industry.

Therefore I consider that all elements of all claims of the '995 Patent discussed by Dr. Chandra are merely the predictable use of known elements.

*Id.* at 243–44. Despite his ultimate conclusion that a person with ordinary skill in the art would have found it obvious to combine these elements, Halmos does not, as Plaintiff points out, actually identify any teaching, suggestion, or motivation that would encourage a person with ordinary skill to combine the elements in the way articulated in the '995 Patent. *See* Pl.'s Invalidity Br. at 20 ("Absent, however, from Halmos' analysis is any discussion of why an inventor would be motivated to

[modify a two-roll-bending machine to produce ribs and flares in sheet metal].").

In *Innogenetics, N.V. v. Abbott Laboratories,* the Federal Circuit affirmed the holding of a district court that an expert opinion was insufficient to support a finding of obviousness where it did nothing more than list prior art references and then conclude that it would have been obvious to one skilled in the art to combine those references:

The district court did not err in finding that Dr. Patterson's report on the alleged obviousness of the asserted claims of the '704 patent was deficient for purposes of disclosure under Rule 26. For each of the claims that he analyzes for obviousness, Dr. Patterson merely lists a number of prior art references and then concludes with the stock phrase "to one skilled in the art it would have been obvious to perform the genotyping method in [claims 1–9 & 12–13] of the '704 patent." "[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn,* 441 F.3d 977, 988 (Fed.Cir.2006); *see also KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007) ("To facilitate review, this analysis should be made explicit.") (citing *Kahn,* 441 F.3d at 988). Nowhere does Dr. Patterson state how or why a person ordinarily skilled in the art would have found the claims of the '704 patent obvious in light of some combination of those particular references. As the district court found: "It is not credible to think that a lay jury could examine the Cha application, the Resnick '718 patent that defendant cited as prior art or any of the other references and determine on its own whether there were differences among them and the '704 patent." *Innogenetics, N.V. v. Abbott Labs.,* No. 05–C–0575–C, slip op. at 14 [578 F.Supp.2d 1079, 1087] (W.D.Wis. Jan. 3,

2007). Such vague testimony would not have been helpful to a lay jury in avoiding the pitfalls of hindsight that belie a determination of obviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (discussing the "importance of guarding against hindsight ... and resist[ing] the temptation to read into the prior art the teachings of the invention in issue" when considering the obviousness of a patent). *Id.* at 1373. The *Innogenetics* court, mindful of avoiding the "rigid application" of the TSM test overruled in KSR, further stated that its determination was not contrary to KSR: "There was a complete absence of any proof that one skilled in the art would find the particular claimed method obvious based upon Dr. Patterson's list of prior art references or the knowledge generally available to those of ordinary skill in the art for *any* reason." *Id.* at 1374 n. 3. Indeed, the Federal Circuit found that, even after KSR, it "must still be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention." *Id.*

▮ After careful review of Halmos' expert report, the Court agrees that it suffers from the same deficiency as the expert report in *Innogenetics*, namely it fails to provide an "articulated reasoning with some rational underpinning to support the conclusion of legal obviousness." *Innogenetics*, 512 F.3d at 1373 (internal quotations omitted). Accordingly, Halmos' expert report, standing alone, does not provide clear and convincing evidence that would lead the Court to conclude as a matter of law that an ordinary person skilled in the art would have conceived to combine the various prior art elements in the way described in the Claims of the '995 Patent. Halmos' report is even less convincing with respect to Claims 3–5 and 14, which all have a "flare" component to the die. While Halmos opines that Valentine teaches flanges, which he equates to "flared ridges," his primary opinion with regard to the flares is that it would be "self understood" that flared ridges would reinforce a material from bending. *See* Def.'s Invalidity App. at 227–28, 235 (regarding Claims 4–5 and 14). In his final summary, Halmos does not even mention the flares specifically, opining instead that "a person with ordinary skill and knowledgeable in the art can easily implement a change by adding ribs to the rigid roll surface of a two-roll-bending machine." *Id.* at 244. Knowledge that flanges or flared ribs will operate to reinforce sheet metal simply does not constitute evidence that it was obvious to combine flanges or flares with ribs on a die used with a two roll-bending machine.[18]

The conclusions of the Patent Examiner in rejecting the original claims as-filed

---

**18.** The Court further notes that, though his testimony is subject to an as-yet undecided Motion to Exclude, Plaintiff's expert, Dr. Chandra, reached a far different opinion on obviousness than did Halmos:

> Sabasta's device is distinguishable from all of the prior art presented in the report by Halmos and is a novel, non-obvious advance in the roll forming field. By homogenizing the resulting strain field in the sheet ... the innovation by Sabasta makes the process much less prone to defect formation due to strain localization. The im-

proved reliably of the process, coupled with its ease of set-up and operation, makes Sabasta's innovation a highly attractive commercial alternative for manufacturing ribbed and flared saddles. None of the prior art employed all of the features of Sabasta's invention. Sabasta's invention is the first to use a pliable roller to make a ribbed product with flared ends. In my opinion, Sabasta's invention was a substantial, novel, non-obvious advancement of the existing technology.

Pl.'s Invalidity App. at 27.

adds little to the equation. The Court finds two facts about the Patent Examiner's rejection notable. First, although the Patent Examiner rejected Claims 1–5, 10, 15, and 20, which Defendant contends amounted to a rejection of "a ribbed die with ribs and flares in conjunction with a two roll-bending machine" (Def.'s Invalidity Reply at 15), the Patent Examiner never actually mentioned flares as appearing in the prior art, although he did reference Valentine in an attached list of references. Def.'s Invalidity App. at 182. Indeed, the word "flares" does not even appear in the content of the Patent Examiner's Office Action. Second, the Patent Examiner does not offer any explanation for his conclusion that the subject matter of the claims would have been obvious to a skilled artisan at the time of invention, thus offering no input into the teaching, suggestion, or motivation that would have encouraged a skilled artisan to combine either the flares or any other identified prior art elements into the subject matter of the '995 Patent. Rather, the patent examiner concludes without explanation that Claims 1–5 and 15 "would have been obvious to the skilled artisan at the time of the invention" in the face of prior art. *See id.* at 178–79.

While rejection of the conclusory opinions of Halmos and the Patent Examiner for purposes of the present motion does prohibit Defendant from attempting to prove obviousness through other sources at trial, the fact remains that in the present case, the *only* specific evidence asserted by Defendant that even arguably touches on a teaching, motivation, or suggestion to combine prior art elements is the Patent Examiner's rejection and Halmos' expert report. *See Innogenetics,* 512

F.3d at 1373 (noting that "an expert is not the only source for evidence that it would be obvious for one skilled in the art to combine references to reach the claimed method. But, as the district court held, 'some kind of motivation must be shown from some source, so that the jury can understand why a person of ordinary skill would have thought of either combining the two or more references or modifying one to achieve the patented method'"). Indeed, outside of its prosecution estoppel theory and the brief reference to Halmos' report in footnote 5 of its Brief, Defendant does not make *any* argument or cite to *any* evidence in the record that would explain why a person of ordinary skill in the field, "facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit" to combining the elements as in the '995 Patent. *See KSR,* 550 U.S. at 423, 127 S.Ct. 1727. Neither does Defendant even reference the "objective reach of the claims" or whether there was a "known problem for which there was an obvious solution encompassed by the patent's claims." *See id.* at 420, 127 S.Ct. 1727. Without clear evidence and testimony about the nature of the roll forming field and the knowledge of an ordinary artisan skilled in that field, the Court, simply put, lacks sufficient evidence to reach a conclusion that the Claims of the '995 Patent are invalid for obviousness in this case. *See Innogenetics,* 512 F.3d at 1373 (noting that vague testimony would be insufficient to permit a determination of the differences between the patent and the prior art). Thus, in light of the presumption of the patent's validity, the Court finds that Defendant has failed to establish a prima facie case, by clear and convincing evidence, that Claims 1–5 and 14–15 of the '995 Patent are obvious in light of the prior art.[19] Ac-

19. Because the Court is convinced that the evidence is insufficient to support a grant of summary judgment on the question of obvi-

ousness at the prima facie level, the Court will

cordingly, Defendant's Motion for Summary Judgment of Invalidity of Claims 1–6 and 14–15 is denied.

## B. *Inequitable Conduct*

Patent applicants must prosecute patent applications before the USPTO with candor, good faith, and honesty. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed.Cir.1995). This "duty of candor" applies to the inventor, the prosecuting agents or attorneys of the inventor, and "[e]very other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application." 37 C.F.R. § 1.56(c). A breach of the duty of candor may constitute inequitable conduct, which renders an otherwise valid patent unenforceable. *See Molins*, 48 F.3d at 1178. Buckaroos asserts that Sabasta violated the duty of candor by failing to inform the USPTO of a feature of material prior art, namely the fact that the Acrotech 1618 machine employs on its small OD Attachment, as a standard feature, "mounting portions" that engage "cam rollers" for purposes of aligning a die. Def.'s Inequitable Mot. at 2. Buckaroos contends that if Sabasta had informed the USPTO of the details of the Acrotech machine, it would have contradicted the critical distinction Sabasta relied upon in obtaining the '995 Patent. *Id.* Accordingly, Buckaroos requests that the Court deem the '995 Patent unenforceable for Sabasta's inequitable conduct.

"A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution." *Larson Mfg. Co. of S.D., Inc. v. Aluminart Prods. Ltd.*, 559 F.3d 1317, 1326 (Fed.Cir. 2009) (quotation and citation omitted); *Life Techs., Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1324 (Fed.Cir.2000) ("Inequitable conduct can consist of affirmative misrepresentations of material fact, submission of false material information, or the failure to disclose known material information during the prosecution of a patent, coupled with the intent to deceive the PTO."). "Materiality and intent to deceive are distinct factual inquiries" and the burden is on the moving party to demonstrate each by "clear and convincing evidence." *Life Techs.*, 224 F.3d at 1324 (citing *Elk Corp. v. GAF Bldg. Materials Corp.*, 168 F.3d 28, 30 (Fed.Cir.1999)); *see also Hoffmann–La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1359 (Fed.Cir.2003) (stating that a "party seeking to have a patent declared unenforceable has a heavy burden to meet").

Even once the threshold levels of materiality and intent are met, "the ultimate determination of inequitable conduct is within the discretion of the trial court, which must make the equitable judgment concerning whether the applicant's conduct is so culpable that the patent should not be enforced." [20] *Life*

---

not delve into an extensive discussion of Plaintiff's rebuttal evidence.

**20.** The Federal Circuit has held that there is no right to a jury trial on questions of inequitable conduct:

[T]he decision respecting inequitable conduct is a discretionary decision to be made by the judge on his or her own factual findings. Thus, a disputed finding of intent to mislead or to deceive is one for the judge to resolve, not the jury, albeit not on summary judgment if there is a genuine dispute. A patentee has no right to a jury trial respecting the factual element of culpable intent as part of the defense of inequitable conduct.

*Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993).

*Techs.*, 224 F.3d at 1324 (citing *Kingsdown Med. Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed.Cir.1988) (en banc)). "In making this determination, the court must conduct a balancing test between the levels of materiality and intent, with a greater showing of one factor allowing a lesser showing of the other." *Id.* (citing *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed.Cir.1997) ("The more material the omission or the misrepresentation, the lower the level of intent required to establish inequitable conduct, and vice versa.")). Once a district court has balanced the equitable considerations and concluded that inequitable conduct has occurred, however, it "has no discretion to decide whether a patent is unenforceable." *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1243 (Fed.Cir.2008) (citing *Kingsdown*, 863 F.2d at 877, for the following statement: "When a court has finally determined that inequitable conduct occurred in relation to one or more claims during prosecution of the patent application, the entire patent is rendered unenforceable."). While a grant of summary judgment for inequitable conduct is permissible, the Federal Circuit has "urge[d] caution" in granting summary judgment for inequitable conduct, *Paragon Podiatry Lab., Inc. v. KLM Labs., Inc.*, 984 F.2d 1182, 1190 (Fed.Cir.1993), noting that "the habit of charging inequitable conduct in almost every major patent case has become an absolute plague." *Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed.Cir.1988).

Buckaroos argues that Sabasta's initial "claims to a two roll-bending machine with dies having flares and ribs were rejected by the USPTO as not patentable." Def.'s Inequitable Br. at 1. Buckaroos contends that Sabasta did not argue the rejections, thereby conceding that his claims were unpatentable. *Id.* Rather, Sabasta "incorporated a recitation regarding 'cam rollers' arranged to engage and align the dies," and relied on this as a "critical distinction over the prior art to assert that the claimed arrangement was patentable." *Id.* According to Buckaroos, Sabasta's failure to inform the USPTO that the prior art Acrotech machine he purchased arrived with "cam rollers" as a standard component amounts to a violation of the duty of candor and should result in a finding of inequitable conduct because "Sabasta made affirmative representations relying on the cam rollers as *the critical element* to distinguish his claimed invention from the prior art despite knowing that the Acrotech machine would have contradicted and refuted his arguments and representations if he had disclosed it." *Id.* at 5. Buckaroos argues that Sabasta's intent to deceive the USPTO by withholding this material prior art is apparent because Sabasta concedes that the Acrotech machine and the manual show the "same basic idea" as the cam rollers employed in the '995 Patent, but "did not recall" whether the Acrotech manual was submitted to the USPTO and "was unable to supply any credible explanation for his failure to disclose it to the USPTO." *Id.*

Sabasta counters that information regarding the Acrotech machine was immaterial to the patent examination; cam rollers are not part of Sabasta's invention; the Acrotech machine was disclosed to the USPTO; and other prior art submitted to the USPTO was much more pertinent to Sabasta's patent application. *See generally* Pl.'s Inequitable Resistance Br. Sabasta additionally contends that Buckaroos has failed to present any evidence, let alone clear and convincing evidence, of an intent by Sabasta to deceive the USPTO. *Id.*

1. *Materiality.*

 In determining the materiality element, the Federal Circuit has instructed

that information is material "when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Larson,* 559 F.3d at 1326. The starting point in the determination of materiality is the definition of the USPTO, which states: " '[I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and ... [i]t refutes, or is inconsistent with, a position the applicant takes in ... [a]sserting an argument of patentability.' " *Critikon,* 120 F.3d at 1257 (quoting 37 C.F.R. 1.56(b)(2)(ii) (1996)); *see also Molins,* 48 F.3d at 1179 ("If the information allegedly withheld is not as pertinent as that considered by the examiner, or is merely cumulative to that considered by the examiner, such information is not material.").

Defendant argues that, in Sabasta's original patent application, Sabasta "applied for broad claims direct to the combination of a ribbed die and a two-roll-bending machine," and the USPTO rejected those claims as not patentable in view of the prior art. Def.'s Inequitable Br. at 7. Defendant claims, as it did in the obviousness context, that Plaintiff conceded that the claims as submitted were not patentable and "only obtained allowance of original independent claims 1 and 15 by narrowing and amending them to incorporate a limitation requiring that the die have mounting portions at each end which engage cam rollers of the machine to maintain the alignment of the die." *Id.* at 7–8. Defendant contends that since the "recitation that the die has mounting portions at each end to engage cam rollers of the machine" was the only change between the rejected and the ultimately approved claims, it is clear that the "recitation that the die has mounting portions at each end to engage the cam rollers of the machine" was the "critical distinction" Sabasta made

to overcome the Patent Examiner's prior art rejections. *Id.* at 7, 11.

Sabasta's original claims 1 and 15 provide for:

1. A roll-bending die for being used with a roll-bending machine for producing rib reinforced rolled material, the roll-bending die comprising:

a body member being adapted for being rotably coupled to the roll-bending machine such that said body member selectively engages a pliable roller of the roll-bending machine, said body member being adapted for being rotated by the pliable roller when the pliable roller is rotated by the roll-bending machine such that said body member rolls the material into an arc when the material is placed between said body member and the pliable roller; and

said body member comprising at least one ridge portion outwardly extending from the perimeter face of said body member, said ridge portion being adapted for pressing a rib into the material when the material is rolled between said body member and the pliable roller of the roll-bending machine.

. . .

15. A roll-bending die for being used with a roll-bending machine for producing rib reinforced rolled material, the roll-bending die comprising:

a body member being adapted for being rotatably coupled to the roll-bending machine such that said body member selectively engages a pliable roller of the roll-bending machine, said body member being adapted for being rotated by the pliable roller when the pliable roller is rotated by the roll-bending machine such that said body member rolls the material into an arc when the material is placed between said body member and the pliable roller;

said body member comprising a plurality of ridge portions outwardly extending from a perimeter face of said body member, said ridge portions being adapted for pressing ribs into the material when the material is rolled between said body member and the pliable roller of the roll-bending machine;

each of said ridge portions annularly extending around said body member such that each of said ridge portions extends around the circumference of said body member, said ridge portions being adapted for forming circumferential ridges in the material when the material is rolled between said body member and the pliable roller for reinforcing the material against bending;

said body member comprising a pair of flared ridges, each of said flared ridges outwardly extending from said perimeter face of said body member such that said flared ridges are adapted for forming a flared portion in the material when the material is rolled between said body member and the pliable roller;

each of said flared ridges of said body member annularly extending around said body member such that each of said flared ridges extends around the circumference of said body member, said flared ridges being adapted for forming circumferential flared portions in the material when the material is rolled between said body member and the pliable roller for reinforcing the material against bending; and

each of said flared ridges of said body member being positioned adjacent one of a pair of opposing ends of said body member such that said flared ridges are adapted for forming the circumferential flared portions adjacent each of the free ends of the material when the material

is rolled between said body member and the pliable roller.

Def.'s Invalidity App. at 153, 158–160.

The Patent Examiner rejected Claims 1 and 15 "as being unpatentable over Howell." *Id.* at 178. Claim 1 was further rejected "as being unpatentable over Okude (Japanese document no. 0156025) in view of Hanson (3,040,799)." *Id.* at 179. To overcome this rejection, Sabasta added the following paragraph to the end of each of Claims 1 and 15:

said body member comprising a pair of mounting portions, each of said mounting portions outwardly extending from opposing ends of said body member, each of said mounting portions being aligned along a longitudinal axis of said body member, each of said mounting portions being adapted for being engaged by a plurality of cam rollers on the roll-bending machine for maintaining alignment of said body member with the pliable roller of the roll-bending machine.

The paragraph added to each of Claims 1 and 15 was found in the original patent submission as dependent Claim 6 and also as dependent Claim 16. *See id.* at A.154–A.155. With regard to the original dependent Claims 6 and 16, the Patent Examiner stated that they were "objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." *Id.* at A.18.

Thus, in support of a request that the patent submission be reconsidered in light of the amendments, Sabasta stated:

Claims 1–5, 10, 15 and 20 have been rejected under 35 U.S.C. Section 103(a) as being unpatentable over Howell (3,150,707).

Claim 1, particularly as amended, requires said body member comprising a

pair of mounting portions, each of said mounting portions outwardly extending from opposing ends of said body member, each of said mounting portions being aligned along a longitudinal axis of said body member, each of said mounting portions being adapted for being engaged by a plurality of cam rollers on the roll-bending machine for maintaining alignment of said body member with the pliable roller of the roll-bending machine. These limitations have been taken from Claim 6.

Examiner has indicated in paragraph 5 of the Office Action that the prior art of record fails to teach or adequately suggest the claimed features of claim 6 together with the base claim and any intervening claims. Therefore, claim 1, by virtue of its incorporation of the limitations of claim 6 and any intervening claims, is believed to be allowable.

. . .

Claim 15, particularly as amended, requires said body member comprising a pair of mounting portions, each of said mounting portions outwardly extending from opposing ends of said body member, each of said mounting portions being aligned along a longitudinal axis of said body member, each of said mounting portions being adapted for being engaged by a plurality of cam rollers on the roll-bending machine for maintaining alignment of said body member with the pliable roller of the rollbending machine. These limitations have been taken from Claim 6.[21]

Examiner has indicated in paragraph 5 of the Office Action that the prior art of record fails to teach or adequately suggest the claimed features of claim 16 together with the base claim and any

intervening claims. Therefore, claim 1, by virtue of its incorporation of the limitations of claim 16 and any intervening claims, is believed to be allowable.

*Id.* at 196–97.

Defendant insists that the "Acrotech machine and manual are directly inconsistent with and refute the position taken by Sabasta in overcoming the Examiner's prior art rejections.... Sabasta explicitly amended his pending claims to add the limitation which required that cam followers engage the die [and] relied on this as *the* critical distinction to overcome prior art rejections...." Def.'s Inequitable Br. at 11. The Court agrees with Defendant that the Plaintiff relied on the mounting portion/cam roller limitation to overcome the Patent Examiner's rejection of the as-submitted claims. To overcome the Patent Examiner's rejections, Plaintiff explicitly stated that it believed the independent claims to be allowable based on the incorporation of the formerly dependent claim limitation providing that the die comprise "a pair of mounting portions" that extend from the opposite ends of the die and that are designed to engage cam rollers on a roll-bending machine for purposes of maintaining the die's alignment. *See* Def.'s Invalidity App. at A196–97. After receiving this amendment, the Patent Examiner subsequently approved Plaintiff's patent application. Given these facts, the Court has no doubt that prior art teaching a die that comprises mounting portions to engage preexisting cam rollers on a two-rollbending machine would be considered by a reasonable patent examiner to be important in a determination of whether to allow an application to issue as a patent. *See Larson*, 559 F.3d at 1326.

---

21. Given the language of the following paragraph referencing Claim 16, the Court presumes Sabasta meant to reference Claim 16 rather than Claim 6. Regardless, Claims 6 and

16 of the original patent submission, and as incorporated to the amended patent submission in Claims 1 and 15, are identical.

Moreover, prior art evidencing a mounting portion like that in the incorporated limitation would certainly be "inconsistent with" Plaintiff's position that Claims 1 and 15 are "allowable" in light of the addition of the mounting portion limitation. *See* 37 C.F.R. 1.56(b)(2)(ii). The Acrotech manual and promotional materials clearly show a small die with mounting portions that engages cam rollers in the Small OD Attachment. *See* Def.'s Invalidity App. at 67, 71 (photographs of Small OD Attachment of Acrotech Machine), 45 (Acrotech manual, providing: "The Small OD Attachment . . . replaces the upper steel shaft, and essentially consists of a beam to which are attached shaft assemblies . . . of different lengths and diameters. Slip–On Tubes can be used over these shafts or mandrels for special size combinations. The complete assembly is engineered so that whichever mandrel and/or tube is used, it will always bear against the urethane roll to curve a perfect part."). More significantly, Plaintiff admits that the Small OD Attachment is standard on the Acrotech machine that Plaintiff received, and that "[w]hen the Acrotech machine is configured with the small OD attachment, the die of the 1″ and 2″ shaft assemblies *include mounting portions at each end,* where *each die end engages two cam rollers* on the Small OD attachment *to align the die.*" See Def.'s Facts 2 ¶¶ 4–6; *see also* Def.'s Invalidity App. at 23–31 (testimony of Andrew Oliver, discussing the function of the small OD Attachment).

Despite these factors, Plaintiff nonetheless argues that the Acrotech 1618 machine was immaterial; the Acrotech machine was, in substance, disclosed to the Patent Examiner; and the Acrotech machine and manual were less pertinent than other art the examiner considered. *See* Pl.'s Inequitable Resistance Br. at 10–16. The Court will examine each assertion in turn. First, Plaintiff contends that the Acrotech machine was immaterial. *Id.* at

10–11. Plaintiff argues that the "mounting portions" limitation is the critical distinction, not the "cam rollers" reference as Defendant contends. *Id.* The Court agrees with Plaintiff that Defendant has repeatedly referred to the "cam rollers" as the critical distinction, despite the fact that the plain language of the added limitation makes it apparent that the cam rollers referenced therein are presumed to be a standard component on a two-roll-bending machine. It is clear from the pleadings, however, that Defendant, however inartfully, is asserting that it is the contents of the *limitation* that Plaintiff relied on as critical to overcome the Patent Examiner's rejection. *See* Def.'s Reply Br. at 3 ("Sabasta critiques Buckaroos' usage of 'a recitation regarding "cam roller" arranged to engage and align the dies' as a short-hand reference . . . and argues that Buckaroos' argument is 'incorrectly premised in part on the idea that "cam rollers" are part of the claimed invention.' Sabasta uses 'mounting portions' as an allegedly better short-hand reference. This is an argument without substance and does not raise a factual dispute. . . . There is [ ] no dispute that the prior art Acrotech Machine included dies corresponding to the [claims], namely [ ] that the dies have a pair of mounting portions outwardly extending from opposing ends, aligned along a longitudinal axis and adapted for being engaged by a plurality of cam rollers of the roll-bending machine to maintain alignment of the die with the pliable roller of the roll-bending machine. This does not change no matter which short-hand reference is used to refer to the final clause of [the claims].") Indeed, Defendant asserts that the mounting portions and the cam rollers are *both* readily apparent and, in fact, are standard features on the Acrotech machine's Small OD Attachment. This assertion is supported by Plaintiff's admission that the Acrotech machine has as a

standard component a Small OD Attachment which includes die shaft assemblies with "mounting portions at each end, where each die end engages two cam rollers on the Small OD attachment to align the die." Def.'s Facts 2 ¶ 5.

▮ Plaintiff further argues that Defendant is improperly attempting to use the same prosecution history estoppel theory it asserted in support of its Motion for Summary Judgment of Invalidity of Claims 1–6 and 14–15, stating that "Prosecution history estoppel is not applicable to patentability." Pl.'s Invalidity Resistance Br. at 11–12 (arguing that the Patent Examiner's determinations in the prosecution of the patent are "not decisive with regard to issues of validity"). Plaintiff is largely correct in the quoted statement, as the Court discussed extensively *supra.* Plaintiff's argument, however, is misplaced in the context of an analysis of inequitable conduct. A patent is not rendered invalid by a finding that a patentee engaged in inequitable conduct in the prosecution of a patent; rather, a patent is rendered unenforceable. *See, e.g., Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1213 (Fed.Cir.1987) (noting that "a patent may be valid and yet be rendered unenforceable for misuse or inequitable conduct"); *see also Agfa Corp. v. Creo Prods. Inc.,* 451 F.3d 1366, 1373 (Fed.Cir.2006) ("[M]ateriality of prior art is distinct from validity issues."). Moreover, in determining whether prior art is material for purposes of an inequitable conduct analysis, the Court must evaluate whether a "reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Larson,* 559 F.3d at 1326. "Information concealed from the PTO may be material even though it would not invalidate the patent." *Li Second Family Ltd. v. Toshiba Corp.,* 231 F.3d 1373, 1380 (Fed.Cir.2000).

Plaintiff next contends that "the Acrotech machine was disclosed to the PTO." Pl.'s Inequitable Resistance Br. at 14. On its face, this contention is unsupported by the record, as Plaintiff concedes that it "did not submit information regarding the Acrotech Model 1618 machine or manual to the USPTO in an Information Disclosure Statement." Def.'s Facts 1 at ¶ 25. Plaintiff, nonetheless, argues:

> The drawings and written portions of the application disclosed that the invention, ribbed and flared dies (Court Docket No. 118–16 at A.000167), were used in conjunction with a pre-existing roll-bending machine, which had cam rollers, all of which were pictured in the application. (*Id.* at A.000166). Sabastas's application then also disclosed a number of other components of the roll-bending machine, including a block, a pliable roller, a guide fence, and a feed table. (*Id.* at A.000144–000145; 000151–000152).
>
> Sabasta accordingly disclosed the existence of a two-roll-bending machine with cam rollers to the PTO. While the application did not mention the Acrotech 1618 machine by name, that name is the only relevant aspect of the machine that was not disclosed. The application disclosed that the invention (ribbed dies) would be used in conjunction with the roll-bending machine, which had, among other things, cam rollers. Other than providing the name of the machine, disclosing the Acrotech manual to the PTO would not have provided the examiner with any additional information. The examiner understood that "cam rollers" were parts of an existing roll-bending machine, not part of the claimed dies.

Pl.'s Inequitable Resistance Br. at 14–15.

The Court finds Plaintiff's argument unconvincing. While it agrees that a reasonable patent examiner would not believe Plaintiff was attempting to patent a two-

roll-bending machine, and that a reasonable patent examiner would be aware that the reference to "cam rollers" refers to a pre-existing component of a two-roll-bending machine, the fact remains that the limitation Plaintiff asserted made the claims of the Patent allowable was a reference to mounting portions designed to engage cam rollers for purposes of maintaining a die's alignment on a two-roll-bending machine. These mounting portions designed to engage pre-existing cam rollers were, as admitted by Plaintiff, standard components on the Acrotech machine's Small OD Attachment, yet nothing in the patent application references any prior art that contains such a limitation. As Defendant states, "Sabasta's choice to explicitly identify certain prior art patents in the specification and to formally cite them to the PTO undercuts an interpretation that Sabasta simultaneously intended to implicitly disclose the Acrotech Machine as prior art." Def.'s Inequitable Reply at 4. The fact is that Plaintiff relied on a specific limitation to obtain the patent in this case—the recitation that the die contain mounting portions for engaging cam rollers on a two-roll-bending machine. Despite the fact that these mounting portions for engaging cam rollers are a standard feature on the Small OD Attachment of the Acrotech machine, Plaintiff did not disclose the Acrotech machine, its manual, or the Small OD Attachment to the patent examiner, and did not explicitly or implicitly indicate through its other prior art references and specification recitations that such a feature could be found in a source predating the patent application.

■ Plaintiff finally argues that the Acrotech machine and manual were "less pertinent than other art the examiner considered." Pl.'s Inequitable Resistance Br. at 15. Specifically, Plaintiff posits that the patent Examiner in this case considered several prior art references that relate to "two-roll-bending machines in general,"

namely, Hanson, Okude, and Valentine. *Id.* According to Plaintiff, "[t]hese prior art references are much more pertinent to an application for a ribbed and flared die than a two-roll-bending machine with smooth rolls, such as the Acrotech 1618 machine." *Id.* at 16. None of the prior art references, however, disclose what the Acrotech machine and manual would have, i.e., a shaft or die type assembly that employs mounting portions designed to engage cam rollers on a two-roll-bending machine. For instance, Hanson discloses only "rollers [ ] mounted on bearings to rotate on their respective axes and in opposite directions." Def.'s App. at 133. Valentine discloses a top roll that is "mounted on [a] shaft which is journaled on support columns." *Id.* at 137. While the prior art references actually disclosed certainly were highly pertinent to the Patent Examiner's determination of whether a patent should issue in this matter, they were not more pertinent than the Acrotech machine, which contained as a standard component the *precise* limitation ultimately relied on by Plaintiff in obtaining the '995 Patent.

For these reasons, the Court concludes that the Acrotech machine and manual were highly material prior art references that "a reasonable examiner would consider [ ] important in deciding whether to allow the application to issue as a patent." *Larson*, 559 F.3d at 1326. Additionally, the Acrotech machine and manual were not cumulative to prior art already in the record before the USPTO and they are inconsistent with, and indeed refute in large part, the argument of patentability that Plaintiff made to obtain allowance of the '995 Patent. That is, Plaintiff relied on the addition of the mounting portion/cam roller limitation to make the claims previously rejected by the Patent Examiner allowable, but failed to disclose the Acrotech machine and manual that

contained a standard component virtually identical to the limitation claimed.

### 2. *Intent.*

■■■ "Intent to deceive cannot be inferred from a high degree of materiality alone, but must be separately proved to establish unenforceability due to inequitable conduct." *Astrazeneca Pharmaceuticals LP v. Teva Pharmaceuticals USA, Inc.,* 583 F.3d 766, 770 (Fed.Cir.2009) (citing *Kingsdown,* 863 F.2d at 876). With regard to the intent requirement, it is clear that a finding of deceptive intent cannot be based on mere inferences or even on a finding that particular conduct amounts to gross negligence. *See Hebert v. Lisle Corp.,* 99 F.3d 1109, 1116 (Fed.Cir. 1996) (citing *Kingsdown,* 863 F.2d at 876). Rather, a court must determine that " 'the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, [ ] indicate[s] sufficient culpability to require a finding of intent to deceive.' " *Impax Labs., Inc. v. Aventis Pharms. Inc.,* 468 F.3d 1366, 1374–75 (Fed.Cir.2006) (quoting *Kingsdown,* 863 F.2d at 876). Since "[d]irect evidence of intent or proof of deliberate scheming is rarely available in instances of inequitable conduct[, . . .] intent may be inferred from the surrounding circumstances." *Critikon,* 120 F.3d at 1256. "For example, intent may be inferred where a patent applicant knew, or should have known, that withheld information would be material to the PTO's consideration of the patent application." *Id.* (citing *Driscoll v. Cebalo,* 731 F.2d 878, 885 (Fed.Cir.1984)). Intent to deceive cannot, however, "be inferred solely from the fact that information was not disclosed; there must be a factual basis for a finding of deceptive intent." *Hebert,* 99 F.3d at 1116 (citing *Braun Inc. v. Dynamics Corp.,* 975 F.2d 815, 822 (Fed.Cir. 1992)). As the Federal Circuit stated in *Molins:*

[T]he alleged conduct must not amount merely to the improper performance of, or omission of, an act one ought to have performed. Rather, clear and convincing evidence must prove that an applicant had the specific intent to . . . mislead[ ] or deceiv[e] the PTO. In a case involving nondisclosure of information, clear and convincing evidence must show that the applicant made a deliberate decision to withhold a known material reference.

48 F.3d at 1183.

Buckaroos argues that Sabasta knew about the Acrotech machine and manual, knew that they were material prior art, and has provided no explanation for his failure to disclose the Acrotech machine and manual to the USPTO. Defendant argues that it "appropriate to draw an inference of an intent to deceive when an applicant fails to disclose highly material information in his possession without a credible explanation." Def.'s Br. at 11. To support its argument that the Court should draw such an inference in the present case, Defendant specifically points to the following asserted deposition testimony by Sabasta:

Q. Does this show the cam followers or the cam rollers?

A. Yes it does.

Q. And the cam rollers shown here are the same as the ones used on your machine?

A. Yes, it's the same basic idea. It's—

Q. Okay. Did you provide a copy of this Acrotech manual, Exhibit 345, to the patent office with your patent application?

A. I don't recall.

Q. Now, you had this manual as of—

A. Yes.

Q. Let me finish the question. You received this manual in approximately September 2001?

A. Yes.

Q. So you had this manual before you filed your patent application?

A. Correct.

Q. You don't recall if it was submitted to the patent office?

. . .

A. I don't remember specifically giving it to the—but it could have been. I don't know.

Def.'s Inequitable Br. at 13–14.

Plaintiff, on the other hand, argues that Defendant has failed to present sufficient evidence to support an inference that Sabasta intended to deceive the USPTO by not disclosing the Acrotech machine and manual. In support of this assertion, Plaintiff has proffered the "Declaration of Steven W. Sabasta," which states in pertinent part:

1. In July 2002, I contacted the law firm of Kardaal & Associates about providing legal assistance in the prosecution of a patent application for the invention that is the subject matter of the patent in this lawsuit, and ultimately retained them to do so.

2. I relied upon the attorney's advice and experience in prosecuting the patent application. For instance, my attorneys conducted a patent search, evaluated the patentability of my invention, and made the required disclosures and submissions to the United States Patent and Trademark Office.

3. To assist with this process, I provided my attorneys with a number of documents and pieces of information, including a photograph of my ribbed and flared roll-bending dies, diagrams of the dies, information re-

garding two-roll-bending machines in general, and the manual for an Acrotech 1618 two-roll-bending machine.

4. I did not draft the application for my patent, including the disclosure statement, specification, or drawings. My attorneys did that for me, and I relied on their expertise. When I signed these various documents submitted to the USPTO, I did so in the belief that my attorneys would submit any other required information and documents to the USPTO.

5. Prior to this litigation, I did not know that the Acrotech 1618 Manual was not provided to the USPTO.

6. I did not know why the Acrotech 1618 Manual was not provided to the USPTO. However, I do know that I had no intent to deceive the patent examiner.

7. At the time my patent application was processed, I did not think the Acrotech Machine or its manual were all that important in determining whether I should obtain a patent, because I was trying to get a patent on roll-bending dies, not on a roll-bending machine.

Pl.'s Inequitable App. at 30–31.

Plaintiff cites *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.* in support of the proposition that Defendant cannot demonstrate deceptive intent merely by pointing out that Plaintiff knew of the Acrotech machine and manual and failed to point them out to the USPTO. *See* 439 F.3d 1335, 1340 (Fed.Cir.2006). In *M. Eagles,* the patentee failed to disclose a material prior art reference to the USPTO. The defendants argued that the patentee reasonably should have known of the prior art reference's materiality because it had been in existence for over

twenty years, and that intent to deceive the USPTO should be inferred by the patentee's failure to provide a good faith explanation for his failure to disclose the prior art. *Id.* The Federal Circuit disagreed, holding that "a failure to disclose a prior art device to the PTO, where the only evidence of intent is a lack of a good faith explanation for the nondisclosure, cannot constitute clear and convincing evidence sufficient to support a determination of culpable intent." *Id.* at 1341.

As in *M. Eagles,* Plaintiff here has failed to provide a credible explanation for its failure to disclose the Acrotech machine and manual to the USPTO. Plaintiff contends that Sabasta supplied his patent attorney with information, including the Acrotech machine and manual [22] and relied on the patent attorney to write the application and determine what information needed to be disclosed. Pl.'s Inequitable Br. at 23–24. According to Plaintiff, "Sabasta does not know why patent counsel did not provide the Acrotech manual to the PTO." *Id.* at 24. Plaintiff argues that it is "not reasonable to infer from this evidence that Sabasta intended to deceive the PTO." *Id.* Rather, Plaintiff argues that it is a reasonable inference that Plaintiff's patent counsel did not submit the Acrotech machine and manual because "counsel believed he had already adequately disclosed the existence of the Acrotech machine in the application, and because he did not believe a two-roll-bending machine with smooth rolls

was material to the patentability of a ribbed and flared die in any event." *Id.*

Plaintiff does not offer an affidavit by patent counsel attesting to why the patent counsel did not disclose the Acrotech machine or manual, nor does Plaintiff offer any legal citation to support his assertion that patent counsel, rather than the patentee, must bear responsibility for any failure in prosecution submissions. Rather, the only support that Plaintiff offers for a "good faith explanation" of the failure to disclose is Sabasta's own affidavit stating that he did not intend to deceive the USPTO.[23] This is insufficient to establish a good faith reason for the nondisclosure. *See Gander Mountain Co. v. Cabela's, Inc.,* 540 F.3d 827, 831 (8th Cir.2008) ("[A] properly supported motion for summary judgment is not defeated by self-serving affidavits."); *Davidson & Assocs. v. Jung,* 422 F.3d 630, 638 (8th Cir.2005) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor."); *Paragon,* 984 F.2d at 1190 ("[M]erely conclusory statements or completely insupportable, specious or conflicting explanations will not suffice" to establish a good faith explanation); *GFI, Inc. v. Franklin Corp.,* 265 F.3d 1268, 1275 (Fed.Cir.2001) ("A mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice."). Indeed, Plaintiff cannot obviate

---

**22.** The fact that Sabasta admittedly supplied his patent attorney with information about the Acrotech machine and manual supports could be viewed as supporting an inference that Sabasta believed that such information was material to his patent application.

**23.** Plaintiff makes much of the facts that "Buckaroos never asked Sabasta why the Acrotech manual was not disclosed to the PTO," and "never sought to depose Sabasta's patent-prosecution counsel." Pl.'s Inequitable Br. at 19–20. The burden to come forth with evidence of a good faith basis for nondisclosure of a material prior art reference, however, does not lie with Defendant. *See Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.,* 537 F.3d 1357, 1368 (Fed.Cir.2008) ("The patentee need not offer any good faith explanation unless the accused infringer first carried his burden to prove a threshold level of intent to deceive by clear and convincing evidence.").

his own duty of candor by, in essence, "passing the buck" to his patent counsel. Both patentees and their attorneys have an ongoing duty of candor and good faith dealing in the prosecution of patent applications, and in this case, a credible explanation for the failure is entirely lacking from both. *See* 37 C.F.R. § 1.56 ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [USPTO], which includes a duty to disclose to the Office all information known to that individual to be material to patentability....").

■ While the lack of a credible explanation alone is insufficient to warrant an entry of summary judgment of inequitable conduct under *M. Eagles,* the present case is distinguishable from *M. Eagles.* "Summary judgment is appropriate on the issue of intent" if there is a "failure to supply highly material information" and if the summary judgment record demonstrates: "(1) the applicant knew of the information; (2) the applicant knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation for the withholding." *Ferring B.V. v. Barr Labs., Inc.,* 437 F.3d 1181, 1191 (Fed.Cir.2006) (citing generally *Paragon,* 984 F.2d 1182, and citing *Bruno Indep. Living Aids v. Acorn Mobility Servs., Ltd.,* 394 F.3d 1348, 1354 (Fed. Cir.2005), and *Critikon, Inc.,* 120 F.3d at 1257). In *M. Eagles,* there was no factual basis for a finding of intent outside of evidence that the patentee lacked a good faith explanation for its nondisclosure. *See* 439 F.3d at 1340–41. In contrast, in the present case, an inference of intent is supported not simply by the lack of a credible good faith explanation for the nondisclosure, but also by independent evidence of a far more substantial factual basis, namely that Plaintiff actually made an argument in favor of patentability that contained, as the primary distinguishing

element, a feature that was not disclosed in any of the prior art before the examiner and that was readily apparent in the undisclosed Acrotech machine and manual. As Defendant correctly emphasizes, Plaintiff "went beyond merely silently failing to disclose the Acrotech machine and manual as a general reference"; rather, he "affirmatively made misrepresentations by failing to disclose the closest, highly material reference which went to *the* critical point of patentability [i.e., the mounting portion/cam roller limitation] which Sabasta relied upon to obtain the '995 Patent." Def.'s Inequitable Reply at 14.

■ The Federal Circuit has squarely held that "a trial court may infer deceptive intent based on a showing that a patentee withheld references with which it was intimately familiar and which were inconsistent with its own patentability arguments to the PTO." *Agfa Corp.,* 451 F.3d at 1378. That is precisely the case in the present matter. It is undisputed on the record that Plaintiff was fully aware of the Acrotech machine and manual, and that Plaintiff was well acquainted with the features of the Acrotech machine, including those of the Standard OD Attachment. *See* Def.'s Facts ¶¶ 5 ("[T]he die of the 1″ and 2″ shaft assemblies include mounting portions at each end, where each die end engages two cam rollers on the Small OD attachment to align the die."); 6 ("The cam roller arrangement is standard equipment on the Acrotech machine with the Small OD configuration."); 8 (establishing that Sabasta read the manual for the Acrotech machine numerous times). The record likewise demonstrates that Plaintiff relied specifically on the addition of the mounting portion/cam roller recitation to overcome the Patent Examiner's rejection of Independent Claims 1 and 15. *See* Def.'s Invalidity App. at 196–99 ("[C]laim 1, by virtue of its incorporation of the

limitations of claims 6 and any intervening claims, is believed to be allowable."; "The above amendment incorporates the limitations of claim 6 (in its as-filed form) into the recitation of claim 1, and therefore claim 1 is believed to be in condition for allowance."; "The above amendment incorporates the limitations of claim 16 (in its as-filed form) into the recitation of claim 15, and therefore claim 15 is believed to be in condition for allowance."). Coupled with the fact that Plaintiff designed the die of the '995 Patent to be used, specifically, in conjunction with the Acrotech 1618 Machine,[24] these factors provide strong support for a conclusion that Plaintiff knew or should have known that the Acrotech machine and manual were material not only to his assertion that the mounting portion/cam roller limitation would make patentability "allowable," but also to the general prosecution of his patent application. Finally, it is apparent on the record that Plaintiff did not disclose the Acrotech machine or manual to the USPTO, despite knowledge of both the prior art and its materiality.

On this evidence, combined with the Court's determination that the Acrotech machine and manual would be highly important to a reasonable patent examiner deciding whether to allow the Plaintiff's application to issue as a patent, and the lack of a credible explanation for the non-disclosure, the Court believes the record contains sufficient clear and convincing evidence to permit an inference of intent to deceive. *See Critikon,* 120 F.3d at 1257 (holding that a "patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish 'subjective good faith' sufficient to prevent the drawing of an inference of intent to mislead"); *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n,* 958 F.2d 1066, 1076 (Fed.Cir.1992) (finding that "direct proof of wrongful intent is rarely available but may be inferred from clear and convincing evidence of the surrounding circumstances" and upholding an ALJ's determination that clear and convincing evidence of intent to deceive existed where "on the basis of misleading arguments made to the PTO for allowance of the claims coupled with the withholding of contemporaneously known prior art which was highly pertinent to the prosecution of the patent appli-

---

24. While referenced in more abbreviated form in the present pleadings, the role and significance of the Acrotech machine in designing the subject matter of the '995 Patent was well described in a prior Order of the Court. *See* Clerk's No. 78 (order granting in part and denying in part a partial motion for summary judgment filed by Defendant). In the Court's summary of undisputed facts, it stated:

In mid–2000, one of Plaintiffs' customers requested an enhanced product, and in response, Sabasta claims to have designed a prototype saddle with flared ends and two ribs in the center. Pl.'s Statement of Material Facts ¶ 4. Since Plaintiffs could not mass produce the prototype saddle with its current equipment, Sabasta began searching for a company that could manufacture a machine to mass produce the product. *Id.* ¶ 5. In approximately March 2001, Sabasta

was told that Acrotech made a machine that might work for the production of his prototype pipe saddles. *Id.* ¶ 6. Sabasta viewed the Acrotech Model 1618 on an internet site and claims to have conceived the idea of fabricating the top roll, or die, of the Acrotech 1618, so that the machine could mass produce his prototype pipe saddle. *Id.* Specifically, Sabasta claims to have come up with the idea of putting ridges in the center of the die so that when metal blanks were rolled between the die and the urethane roll of the roll-bending machine, ridges would be pressed into the metal blanks. *Id.* ¶ 7. Sabasta further believed that if the die was designed to have flared ridges on the ends, the ends of the metal blanks would flare downward when fed between the die and the urethane roll.

*Id.* at 3.

cation"); [25] *Bruno Indep. Living,* 394 F.3d at 1354 (finding that where a patentee "has not proffered a credible explanation for the nondisclosure . . . an inference of deceptive intent may fairly be drawn in the absence of such an explanation").

### 3. *Unenforceability.*

▮▮▮▮ Having concluded that the Acrotech machine and manual were highly material prior art and that the record warrants a strong inference that Plaintiff intended to deceive the USPTO by failing to disclose the Acrotech machine and manual, the Court must now "balance the equities to determine whether the patentee has committed inequitable conduct that warrants holding the patent unenforceable." *Monsanto Co. v. Bayer BioScience N.V.,* 363 F.3d 1235, 1239 (Fed.Cir.2004) (citing *Hoffmann–La Roche,* 323 F.3d at 1359). "[E]ven if a threshold level of both materiality and intent to deceive are proven by clear and convincing evidence, the court may still decline to render the patent unenforceable." *Star Scientific,* 537 F.3d at 1365.

> Only after adequate showings are made as to both materiality and deceptive intent may the district court look to the equities by weighing the facts underlying those showings. "The more material the omission or the misrepresentation, the lower [the] level of intent [is] required to establish inequitable conduct, and vice versa." *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1256 (Fed.Cir.1997). At this second stage, however, the question is no longer whether materiality and/or intent to deceive were proven with evidence that is sufficiently clear and convincing. While the facts of materiality and intent to deceive must be proven by clear and convincing evidence, the district court must balance the substance of those now-proven facts and all the equities of the case to determine whether the severe penalty of unenforceability should be imposed. It is this balancing that is committed to the district court's discretion. *Molins,* 48 F.3d at 1178.

*Id.* at 1367.

▮▮▮▮ The Court is mindful of the severity of the penalty of a finding of inequitable conduct. *See id.* (noting that the inequitable conduct doctrine was initially applied only in cases of fraud, but has been broadened to include less egregious conduct: "[T]hus courts must be vigilant in not permitting the defense to be applied too lightly. Just as it is inequitable to permit a patentee who obtained his patent through deliberate misrepresentations or omissions of material information to enforce the patent against others, it is also inequitable to strike down an entire patent when the patentee only committed minor missteps or acted with minimal culpability or in good faith"). The Court is equally mindful of that fact that "[s]ummary judgments in favor parties who have the burden of proof are rare, and rightly so." *Turner v. Ferguson,* 149 F.3d 821, 824 (8th Cir.1998). On the present facts, however, the Court simply cannot escape a conclusion that the Acrotech machine and manual would have been highly material to a reasonable patent examiner in determin-

---

**25.** Significantly, the *LaBounty* court also rejected an argument that a finding of deceptive intent was not warranted where the materiality of the undisclosed prior art was a "close" question such that the patentee and his attorney could reasonably have determined that the undisclosed devices did not have to be disclosed: "On the contrary, that makes it all the more necessary that the devices should have been disclosed to the examiner. Close cases should be resolved by disclosure, not unilaterally by the applicant." *LaBounty,* 958 F.2d at 1076.

ing whether to grant Plaintiff's patent application and that Plaintiff knowingly failed to disclose the Acrotech machine and manual with an intent to deceive. Indeed, though the Court was unable to determine as a matter of law, based on the record, that many of the '995 Patent's claims are invalid as obvious, the Court finds it quite plausible that a reasonable patent examiner examining the '995 Patent's application would have found its subject matter unpatentable.[26]

Plaintiff has offered no argument or evidence of equitable considerations in this case that would outweigh the Court's findings of materiality and intent. Accordingly, the Court grants Defendant's request for summary judgment on the basis of inequitable conduct and finds the '995 Patent unenforceable. *See Monsanto,* 514 F.3d at 1243 (noting that once a court concludes that inequitable conduct has occurred, it "has no discretion to decide whether a patent is unenforceable" (citations omitted)).

## IV. CONCLUSION

For the reasons stated herein, Defendant's Motion for Summary Judgment of Invalidity of Claims 1–6 and 14–15 (Clerk's No. 118) is DENIED. Defendant's Motion for Summary Judgment of Inequitable

26. Though not discussed in the materiality context specifically, the Court notes that a finding of materiality may also be predicated on a determination that the information is material to patentability, is not cumulative, and "establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim." 37 C.F.R. § 1.56(b)(1).

A prima facie case of unpatentability is established when the information compels a conclusion that the claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in

Conduct (Clerk's No. 128), however, is GRANTED.

IT IS SO ORDERED.

the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

*Id.* "A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references." *Semiconductor Energy Lab. Co., Ltd. v. Samsung Electronics Co., Ltd.,* 204 F.3d 1368, 1374 (Fed.Cir.2000).